

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-2-1997

# Mancia v. Director OWCP

Precedential or Non-Precedential:

Docket
97-3091

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Mancia v. Director OWCP" (1997). *1997 Decisions*. Paper 269.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/269

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 2, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3091

JOSEPHINE MANCIA Widow of
ANGELO MANCIA,

      Petitioner

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES DEPARTMENT OF LABOR,

      Respondent

Petition for Review of an Order of the
Benefits Review Board, United States
Department of Labor

Argued: September 23, 1997

Before: BECKER, SCIRICA and McKEE,
Circuit Judges

(Filed: December 2, 1997)

        TIMOTHY G. LENAHAN, ESQ.
        LISA G. WILSON, ESQ. (Argued)
         Lenahan & Dempsey, P.C.
        Suite 400 Kane Building
        116 North Washington Avenue
        Scranton, PA 18503
        Attorneys for Petitioner

        J. DAVITT McATEER, ESQ.
        Acting Solicitor of Labor
        DONALD S. SHIRE, ESQ.
        Associate Solicitor for Black
        Lung Benefits
        CHRISTIAN P. BARBER, ESQ.
        Counsel for Appellate
        Litigation
        JILL M. OTTE, ESQ. (Argued)
        U.S. Department of Labor
        Office of the Solicitor
        Suite N-2605

Frances Perkins Building
200 Constitution Ave. N.W.
Washington, D.C. 20210
Attorneys for Respondent

OPINION OF THE COURT

McKEE, Circuit Judge.

The widow of a deceased coal miner filed this petition for review of a decision of the Benefits Review Board in which the Board affirmed an Administrative Law Judge's denial of her claim for survivors' benefits under the Black Lung Benefits Act, 30 U.S.C. SS 901-945. For the reasons that follow, we will reverse the Board's affirmance of the Administrative Law Judge's decision and direct that benefits be awarded.

I. BACKGROUND

Angelo Mancia filed two applications for Black Lung benefits during his lifetime. The Department of Labor denied the first one on September 3, 1980. Subsequently, Mancia filed a second application, and on April 3, 1984, Administrative Law Judge ("ALJ") Dunau issued a Decision and Order awarding Mancia the requested benefits. The ALJ found that Mancia proved he had pneumoconiosis,[1] a

_____

1. Pneumoconiosis is defined as:

2

causal relationship between that affliction and his eight years of coal mine employment, and total disability due to pneumoconiosis.

On August 5, 1990, Angelo's wife, Josephine, discovered Angelo dead behind the wheel of the parked family car. Dr. Charles Manganiello, Angelo Mancia's family physician, signed the death certificate that stated that the immediate cause of death was cardiopulmonary arrest with underlying causes of anthracosilicosis with emphysema.

Later that same month, Josephine Mancia filed a claim for survivor's benefits with the Department of Labor. The Secretary administratively denied that claim on February 12, 1991. After the Secretary denied the claim a second time, Josephine requested that the matter be referred to an Administrative Law Judge for a hearing, and the claim was referred to ALJ Ainsworth Brown. Since Mancia had been receiving black lung benefits at the time of his death, a

stipulation was entered into that the only issue to be decided by the ALJ was whether Mancia's death had been caused by pneumoconiosis as required for survivor's benefits under 20 C.F.R. S 718.250(c).

The ALJ denied the claim, and Josephine Mancia appealed to the Benefits Review Board. The Board affirmed the ALJ's decision. It concluded that the ALJ, "within a proper exercise of his discretion as a fact finder, . . . discredited the only medical opinion that could support claimant's burden," and, therefore, the widow "failed to establish that pneumoconiosis played any part in the miner's death. . . ." BRB Decision at 4.

This petition for review followed.

_____

> a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment. This definition includes, but is not limited to, coal workers' pneumoconiosis, anthracosilicosis, anthracosis, anthrosilicosis, massive pulmonary fibrosis, progressive massive fibrosis, silicosis or silicotuberculosis, arising out of coal mine employment.

20 C.F.R. S 718.201.

3

II. THE PROCEEDINGS BEFORE THE ALJ

Josephine Mancia, and Armand Mancia (the miner's first cousin), testified before the ALJ. Josephine also offered the deposition testimony of Dr. Charles M. Manganiello, and a letter from Dr. Manganiello, dated August 26, 1991, in support of her claims. The Director's evidence consisted primarily of a report of Dr. Leon Candor whom the Director had retained to render an opinion as to the cause of Mancia's death. The Director also offered two documents that had been written by Dr. Manganiello in an attempt to support Dr. Candor's conclusion, and impeach the contrary conclusion of Dr. Manganiello.

A. LAY TESTIMONY

Josephine Mancia testified that her husband had been awarded black lung benefits in 1984 and that his health seemed to worsen on a daily basis prior to his death. He could not breathe well and required assistance doing things around the house. She also testified that he was so short of breath that his bed was moved to the first floor as he could not climb stairs, and he was unable to walk very far

before complaining of shortness of breath. Hearing Transcript, at 8-9. Mancia saw Dr. Manganiello for his breathing problems, and was also under the treatment of another physician for an unrelated skin condition. Id. at 10.[2] Josephine testified that her husband never complained of any chest or heart pain and he was never treated for a heart condition. Id.

Josephine further testified that Angelo complained that he could not breathe well about one week before he died. Id. at 11. She returned home from a bus trip to Atlantic City, and found him dead in their car. The motor was not running. Id. at 12.

Armand Mancia, testified that he and Angelo were very close and that they spent a lot of time fishing at a lake in the summertime. Id. at 14. The cottage where they stayed was about 200 to 250 feet from a lake. In the year before

_____

2. That condition was cancer, and all the parties and witnesses agree that that condition is not implicated in Angelo's death.

he died, Angelo had to stop about half-way to the lake to catch his breath. Angelo was able to fish only because the boat was powered by a motor, and Armand did all of the casting. According to Armand, Angelo never complained about chest pain or heart problems, nor did he ever tell Armand he was taking any medication for any heart condition. Armand testified that during the last years of Angelo's life he (Angelo) kept "slowing up," that breathing was a major problem, and that Angelo could not tolerate any physical exertion of any kind because of his problem breathing. Id. at 17.

B. DR. MANGANIELLO'S TESTIMONY

Dr. Manganiello's deposition testimony established that he had been a licensed physician for 15 years, practicing general medicine in a region where coal mining was once the prevalent industry. Approximately 10% of his patients are former coal miners, and he sees those patients primarily for anthracosilicosis and anthracosilicosis-related problems. He is, however, neither board-certified nor board-eligible in cardiology, occupational medicine, pulmonary medicine nor internal medicine. Deposition Transcript, at 7-9.

Dr. Manganiello first began treating Angelo Mancia in 1978, primarily for his underlying pneumoconiosis. He saw

him at least three times a year thereafter. Mancia's medications consisted of bronchodilator therapy and respiratory treatments, as well as oxygen therapy as needed. Id. at 13. Dr. Manganiello testified he agreed to sign Mancia's death certificate at the coroner's request. Id. at 14. That death certificate states that the immediate cause of death was cardiopulmonary arrest with underlying causes of anthracosilicosis[3] with emphysema.

_____

3. The statutory definition of pneumoconiosis includes anthracosilicosis. 20 C.F.R. SS 718.201 & 727.202. The statutory definition of pneumoconiosis (i.e. any lung disease that is significantly related to, or substantially aggravated by, dust exposure in coal mine employment) is much broader than the medical definition, which only encompasses lung diseases caused by fibrotic reaction of lung tissue to inhaled dust. Labelle Processing Co. v. Swarrow, 72 F.3d 308, 312 (3d Cir. 1996).

5

Dr. Manganiello was confronted with Dr. Candor's conclusion that Mancia died of a heart attack. Candor based that conclusion partly upon Dr. Manganiello's entry on the death certificate. Manganiello answered as follows:

> No where (sic) in my death certificate or in my opinions do I feel that I have ever expressed a myocardial infarction as his cause of death. I'm not sure where [Candor] extrapolated that type of information. And I'm not sure from where he draws his conclusion. Mr. Mancia never had any symptoms related to his heart. And again, the reason for me stating that Mr. Mancia died of a cardiopulmonary arrest is because his heart stopped. Why his heart stopped, in my opinion, was because of his underlying lung condition. The patient had difficulty breathing. He had difficulty oxygenating his heart on the basis of his breathing; and his heart stopped; not because his heart developed a clot, or he damaged his heart. He had no symptoms referable to that. And nowhere could I state that he died of a myocardial infarction.[4] And I don't believe that anyone could make that statement. So I am not sure where he extrapolated that information.

Id. at 20-21. Dr. Manganiello was also asked about Dr. Candor's reliance on an April 11, 1991 note written by Dr. Manganiello. As we discuss below, that note is at the heart of the ALJ's rejection of Dr. Manganiello's medical opinion as to the cause of Mancia's death. In that note, Dr. Manganiello wrote that Mancia had suffered a "heart attack" which was a "direct result of his severe anthracosilicosis with emphysema." When asked about that

note, Manganiello stated

> I believe there was one report that I had made, trying
> to embellish or trying to explain a cardiopulmonary
> arrest. And I do believe that that report has been
> mistaken and misunderstood. I totally negate that

_____

4. Dr. Manganiello explained that a cardiopulmonary arrest is "absolutely not" the same as a myocardial infarction. The latter is a heart attack, but the heart does not necessarily stop, and unlike a pulmonary arrest where the heart stops, many patients survive a myocardial infarction. Deposition Testimony, at 26-7.

> report. I do not refer to that in any of my thoughts or
> any of my opinions in terms of his cardiopulmonary
> arrest. And again, I believe his heart stopped on the
> basis of his underlying lung deterioration, and
> problems relating to his underlying anthracosilicosis.

Id. at 21.

On cross-examination, the following exchange occurred in response to a question about Manganiello's treatment of diseases related to pneumoconiosis:

> Q: Dr., in your testimony this morning, you have
> talked about treating Mr. Mancia for his
> pneumoconiosis and related diseases. What are those
> related diseases?
>
> A: The pneumoconiosis basically; the underlying
> infections and problems that he would incur as a
> result of his severe lung disease. Recurrent episodes of
> bronchitis. Problems such as cor pulmonale, or build-
> up of some right-sided heart failure, on the basis of
> severe underlying lung disease; and problems of that
> nature. But all related to his lung disease.

Id. at 22.

Manganiello admitted that his reports did not mention the presence of cor pulmonale and explained that it was not mentioned because it was "basically [an] office concern[ ]," which was not necessary to note in a report. Id. at 22-23.

> You could see that the man had some edema of his
> legs; some swelling in his abdomen from time to time.
> He required some diuretic therapy from time to time for
> the treatment of that problem.

Id. at 23. Dr. Manganiello further explained that he didn't think it was necessary to order objective tests to confirm the presence of cor pulmonale because it can be diagnosed clinically, and because there is really no treatment for the condition once it is diagnosed. Id. "I really don't feel that it was necessary to do that. I believe that a clinical diagnosis can be just as well treated in the office, without any of those studies." Id. at 23.

C. DR. MANCIA'S AUGUST 26, 1991 LETTER

Josephine Mancia also introduced a letter from Dr. Manganiello, dated August 26, 1991, and addressed "TO WHOM IT MAY CONCERN." It reads:

> Mr. Angelo Mancia was under my care for anthracosilicosis. I never treated Mr. Mancia for heart disease or coronary artery disease for that matter.
>
> The death certificate states cardiopulmonary arrest secondary to anthracosilicosis and there has never been a statement that his death was related to a myocardial infarction.
>
> It is therefore my opinion that Mr. Mancia's untimely death was a direct result of his anthracosilicosis.

D. THE DIRECTOR'S EVIDENCE BEFORE THE ALJ

The Director's evidence in opposition to the widow's claim consisted of a two-page report of Dr. Leon Candor,[5] and the aforementioned April 11, 1991 note from Dr. Manganiello. Dr. Candor never examined the miner. His report was based entirely upon his examination of certain medical records and the results of tests that Dr. Manganiello and other physicians had performed over the years. The Director also introduced the death certificate into evidence. Dr. Manganiello's April 11, 1991 note is addressed "TO WHOM IT MAY CONCERN." The entirety of that note is as follows:

> In my opinion Mr. Angelo Mancia (sic) heart attack was a direct result of his severe anthracosilicosis with emphysema which hastened or progressed his underlying coronary artery disease.

Dr. Candor's report details the various medical records he reviewed. They include x-rays and the results of tests that had been performed on Mancia during his lifetime.

Based upon his review of those records, Dr. Candor concluded:

_____

5. The Director's Brief states that Dr. Candor is a Board-certified internist. Director's Br. at 5. However, the ALJ's Decision recites that Dr. Candor is Board-eligible in pulmonary medicine. ALJ's Decision at 3.

8

    1. As noted in Dr. Manganiello's letter of 4/11/91, the immediate cause of Mr. Mancia's death on 8/5/90 was an acute myocardial infarction with resultant cardiopulmonary arrest. The myocardial infarction (heart attack) was caused by underlying coronary artery disease.

    2. The patient's coronary artery disease with resultant myocardial infarction were casually unrelated to pneumoconiosis.

    3. Despite Dr. Manganiello's statement in his letter of 4/11/91, I know of no scientific evidence which indicates that anthracosilicosis or emphysema hasten the progress of coronary artery disease.

    4. The normal arterial oxygen tension at rest and during exercise makes it most unlikely that the patient's chronic lung disease had any effect upon cardiac rhythm and function.

    5. The available information provides no evidence that Mr. Mancia's chronic lung disease was a substantially contributing cause to his death caused by acute myocardial infarction or hastened his death.

E. THE ALJ'S DECISION

The ALJ focused on two aspects of Manganiello's testimony and letters in denying the widow's claim. The ALJ was clearly troubled by Manganiello's assertion that Mancia suffered from cor pulmonale. The ALJ noted that Manganiello's letters did not mention cor pulmonale but that Manganiello did, nevertheless, testify at his deposition that the miner suffered from cor pulmonale. ALJ's Decision at 3. The ALJ rejected Dr. Manganiello's explanation of the apparent contradiction. The ALJ concluded that Manganiello simply assumed that black lung disease played a part in the miner's death, and found that Manganiello's opinion was not well-reasoned, not supported by objective means and not based on competent medical evidence. The

ALJ concluded that Dr. Manganiello "responded disingenuously that the condition `. . . basically were office concerns; not . . . things that I felt needed justification in

these types of letters.' . . He stated that he did not believe that objective testing was necessary." ALJ's Decision at 3.

The ALJ was also troubled by Manganiello's April 11, 1991 note and the doctor's repudiation of it. The ALJ was not convinced by Dr. Manganiello's explanation that he "over embellished [him]self a bit" in the note. Deposition Transcript, at 28. The ALJ wrote:

> Thus, after writing a note containing a premise Dr. Manganiello pulls the rug out by withdrawing the premise of a heart attack. By withdrawing the letter of April 11, 1991 the doctor inferentially, at least, concedes being less than candid.

ALJ's Decision, at 3.

The ALJ relied upon Dr. Candor's conclusion that Mancia died of a myocardial infarction unrelated to his chronic lung disease, and he (the ALJ) concluded that Manganiello's testimony to the contrary was merely an assumption that the miner's lung disease played a role in his death.

> When one views Dr. Manganiello's "rationale" as expressed at his deposition it amounted to nothing more that the doctor assumed that the progressive subjective breathing symptoms were attributable to Black Lung, and that, therefore, when the miner was found dead that Black Lung must have contributed to his death. . . . The most reasonable observation to make is that Dr. Manganiello merely assumed that Black Lung played a part in death. His opinion is not well-reasoned or supported by an objective means and is not found to be based on "competent medical evidence" 20 C.F.R. 718.205(c)(1)(2).

Id. Thus, the ALJ ruled that there is "no credible basis to conclude that coal worker's pneumoconiosis played any part" in the miner's death. Id. at 4.

The Director now argues that the ALJ weighed Manganiello's opinion that pneumoconiosis played a part in the miner's death and Candor's opinion to the contrary and simply made a credibility determination that we ought not overturn.

The Board affirmed the ALJ's decision ruling that the ALJ properly exercised his discretion as a fact-finder and "discredited the only medical opinion that could support claimant's burden." BRB's Decision at 4.

III. SCOPE OF REVIEW

We must examine the entire record and determine if the ALJ's decision is supported by substantial evidence.

> The Board is bound by the ALJ's findings of fact if they are supported by substantial evidence. Our review of the Board's decision is limited to a determination of whether an error of law has been committed and whether the Board has adhered to its scope of review. In doing so, we must independently review the record and decide whether the ALJ's findings are supported by substantial evidence. Substantial evidence has been defined as more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Kowalchick v. Director, OWCP, 893 F.2d 615, 619 (3d Cir. 1990) (citations and internal quotations omitted).

IV. DISCUSSION

Josephine Mancia's claim for survivor's benefits was filed in August of 1990.6 Thus, it was adjudicated under the regulations found at 20 C.F.R. S 718.2.7 Under 20 C.F.R. S 718.205(a), benefits are provided to "eligible survivors of a miner whose death was due to pneumoconiosis." The

_____

6. January 1, 1982, was the effective date of amendments to the Black Lung Benefits Act. Had Josephine been awarded benefits prior to the effective date of the amendments, she would have been entitled to derivative benefits based upon the benefits that had been awarded to Angelo during his lifetime. However, after the amendments became effective, a miner's survivor had to prove that the miner's death was caused by pneumoconiosis. Accordingly, Josephine must establish the cause of Angelo's death without relying upon his eligibility for benefits during his lifetime. See Pothering v. Parkson Coal Co., 861 F.2d 1321 (3d Cir. 1988) for a general discussion of the 1981 amendments.

7. 20 C.F.R. Part 718 governs all claims filed after April 1, 1980.

applicable regulations further provide that a miner's death will be "considered to be due to pneumoconiosis" if any of the following criteria are met:

> (1) Where competent medical evidence established that the miner's death was due to pneumoconiosis, or
>
> (2) Where pneumoconiosis was a substantially contributing cause or factor leading to the miner's death or where the death was caused by complications or pneumoconiosis, or
>
> (3) Where the presumption set forth at S 718.304 is applicable.

20 C.F.R. S 718.205(c); Director, OWCP v. Siwiec, 894 F.2d 635, 638 (3d Cir. 1990).

Josephine Mancia conceded that the S 718.304 8 presumption does not apply to her claim. The Director conceded that, during his lifetime, the miner suffered from pneumoconiosis arising out of his coal mine employment. Consequently, the ALJ only had to decide "whether the miner's death was caused by pneumoconiosis as required by 20 C.F.R. S 718.205(c)." Director's Br. at 3. Thus, Josephine Mancia had to demonstrate by a preponderance of the evidence that her husband's death was hastened by pneumoconiosis. Director, OWCP v. Greenwich Collieries, 512 U.S. 267 (1994). "[A]ny condition that actually hastens death is a substantially contributing cause of death within the meaning of [20 C.F.R. S 718.205(c)(2)]." Lukosevicz v. Director, OWCP, 888 F.2d 1001, 1006 (3d Cir. 1989).

The ALJ discredited Manganiello's testimony because of his "failure" to document cor pulmonale, his April 11, 1991 note, and his repudiation of it. However, based upon our independent review of the entire record we conclude that the ALJ's rejection of Dr. Manganiello's conclusion is not supported by substantial evidence. Accordingly, we disagree with the ALJ's rejection of Manganiello's conclusion that Mancia's death was caused by Black Lung Disease.

_____

8. 20 C.F.R. S 718.304 lists those circumstances which create an irrebuttable presumption of total disability or death due to pneumoconiosis.

A. COR PULMONALE

Cor pulmonale is a cardiovascular disease and is defined as:

> Right ventricular (RV) enlargement secondary to malfunction of the lungs, producing pulmonary artery hypertension that may be due to intrinsic pulmonary disease, an abnormal chest bellows, or a depressed ventilatory drive. The term does not include RV enlargement secondary to left ventricular (LV) failure, congenital heart disease, or acquired valvular heart disease. CP is usually chronic but may be acute and reversible.

THE MERCK MANUAL, Cardiovascular Disorders, 16th ed. (1992). The most common cause of cor pulmonale is "chronic obstructive pulmonary disease (chronic bronchitis, emphysema)." Id. Cor pulmonale has been associated with pneumoconiosis as an end-stage complication. See , e.g., Kusiak, R., Liss, G. M. & Gailitis, M. M., Cor Pulmonale and Pneumoconiosisconiotic Lung Disease: An Investigation Using Hospital Discharge Data, 24(2) Am. J. Ind. Med. 161 (1993) (This study found that cor pulmonale was diagnosed 17 times more frequently than expected among men diagnosed with pneumoconiosis than among other men admitted to the authors' hospital). Thus, given Mancia's undisputed medical history of emphysema and pneumoconiosis, it would not be unusual if he also suffered from cor pulmonale. Part 718 of the applicable regulations specifically refer to the relationship between pneumoconiosis and cor pulmonale.

We have previously stated that

> "[t]he report of a physician about a miner's degree of disability. . . may have a great deal of significance even if a report lacks full documentation. The report does not necessarily indicate the information upon which the physician relied. It is often buttressed by deposition testimony. . . . For example, the Director informs us that an x-ray is not normally relevant to the degree of disability. If the physician's report fails to mention an x-ray, therefore, that failing should not normally affect

13

> the credibility of the physician's finding of total disability.

Director, OWCP, v. Mangifest, 826 F.2d 1318, 1327 (3rd Cir. 1987).

Since cor pulmonale is so commonly associated with

pneumoconiosis, it is not illogical that a treating physician did not document that condition in a miner suffering from black lung disease. This is especially true since Manganiello testified without contradiction that he couldn't treat that condition. The ALJ made his credibility determination based solely upon a reading of the transcript without the advantages that would come from viewing a witness as he or she testifies, and the Director offered no evidence to rebut Manganiello's testimony that Mancia did suffer from cor pulmonale.

Dr. Candor's report does not comment upon the presence or absence of cor pulmonale. The ALJ's conclusion that Manganiello's testimony regarding the presence of cor pulmonale was "disingenuous" amounts to little more than the ALJ substituting his own medical assessment for that of the treating physician. This record does not support the ALJ's jaundiced view of Manganiello's testimony regarding Mancia's cor pulmonale. The ALJ placed too much reliance upon the treating physician's failure to order diagnostic tests absent some medical evidence that diagnostic tests for cor pulmonale were necessary. The ALJ's analysis compels a treating physician to order diagnostic tests which the physician feels are not needed merely to provide "objective tests" that will satisfy an ALJ at a possible subsequent administrative hearing.

B. THE DEATH CERTIFICATE

During his deposition, Manganiello explained that he enters cardiopulmonary arrest as the cause of death on 90% of his death certificates. He added:

> I'd probably put [cardiopulmonary arrest] on 100% of them, but I just sometimes run into the same problem . . . we're into right now. I'm just not sure what the big stigma is about cardiopulmonary arrest.

14

> Cardiopulmonary means that the heart has to stop, as far as my opinion goes. And maybe I'm just signing my death certificates inappropriately. But I just feel that your heart stops. And why does your heart stop? It stops because some condition causes it to stop. That's why I sign them that way. It's my usual customary practice.

Id. at 26. He remained emphatic on cross-examination, and he steadfastly insisted that Mancia did not die because of a heart attack.

In Smakula v. Weinberger, 572 F.2d 127 (3rd Cir. 1978) we noted the common practice of completing death certificates in this manner. There, a miner died suddenly, and his widow applied for survivor's benefits alleging that the miner's death had been caused by black lung disease. The ALJ ruled that the widow had established causation, but the Appeals Council, acting for the Secretary, reversed, and the district court entered summary judgment for the Secretary. On appeal, we remanded with directions to award widow's black lung benefits as the reversal of the ALJ's determinations had not been based upon substantial evidence. The death certificate there stated that the miner died from "coronary occlusion." That was the only cause of death given on the death certificate. We noted, however, that the entry on the certificate was "sparse and unverified by clinical findings [and that] testimony at the hearing cast grave doubt on [the certificate's] reliability." Id. at 131. The mortician who arrived at the scene within 15 or 20 minutes of the miner's collapse testified that he took a death certificate to a local physician who "filled in`coronary occlusion' as the cause of death, signed the certificate, and handed it back to [the mortician]" Id. at 132. That doctor had never examined the miner, and had no basis for concluding that his cause of death was as stated on the death certificate. In affirming the ALJ's determination that the widow had established that the miner's death was caused by black lung disease despite the contrary statements on the death certificate we accepted the mortician's explanation that, "in his experience,. . . standard procedure by the coroner's office was not to bother with examination of the bodies and perfunctorily attribute cause of death to a heart attack." Id.

15

In Hillibush v. Benefits Review Board, 853 F.2d 197 (3rd Cir. 1988), we stated

> We have previously determined that a death certificate listing "coronary occlusion" and neither listing any other contributing conditions, nor indicating that an autopsy or other physical examination had been made of the body, is inherently unreliable and does not constitute substantial evidence that the miner died of a coronary occlusion for purposes of determining a widow's entitlement to black lung benefits. In that case there was testimony that it is common practice, absent an autopsy, for coroners to enter coronary occlusion as the cause of death of miners.

853 F.2d at 204. We ruled "[w]e hold that in the absence of an autopsy, a death certificate may not be used to preclude

invocation of a presumption of a totally disabling respiratory or pulmonary impairment." Id.

Although this case is distinguishable, our holding in Smakula and Hillibush is instructive in assessing the probative value of Manganiello's statements on the death certificate, and his credibility in explaining the entry. There, as here, there was lay testimony about the deceased miner's difficulty in breathing, and the degree to which that difficulty appeared to compromise his health and limit his daily routine. Similarly, there, as here, "no doctor had ever attributed her husband's progressive respiratory difficulties to a heart ailment." Smakula, 572 F.2d at 133. More importantly, here, Dr. Manganiello related Mancia's stopped heart to his pneumoconiosis on the death certificate. "[T]he fact that the immediate cause of death was cardiac arrest does not preclude the possibility that the miner had a respiratory or pulmonary impairment; the two conditions are not inconsistent with each other."9  Id.

_____

9. Dr. Manganiello explained that coronary artery disease is not related to pneumoconiosis and that pneumoconiosis does not cause coronary artery disease, although it could be a risk factor for coronary artery disease. Deposition at 29.

C. THE APRIL 11, 1991 NOTE

Mancia's cryptic note of April 11, 1991, is far more troubling. Although the ALJ was not required to accept Manganiello's explanation of the contents of that note, nor his repudiation of it, the ALJ was not free to ignore the totality of the "objective evidence" that he complained was lacking, and the lay corroboration of that evidence, and give inappropriate weight to that note. The objective tests that were performed, the testimony of Mancia's treating physician, and the uncontradicted testimony of Josephine and Armand Mancia all clearly establish that Mancia never complained of, and was never treated for, any heart problem. Similarly, as is discussed more fully below, Dr. Candor ignored Mancia's entire medical history in order to focus upon the 27 word note written in unexplained circumstances. Candor concluded that Mancia died of a heart attack unrelated to his black lung disease even though there is no evidence that any of the numerous objective tests that were performed in the 12 years preceding Mancia's death suggested a heart problem.

Josephine testified that a week before his death her husband, "was telling [her] that he couldn't breathe and he

was to go to Manganiello. And when he couldn't breathe, he used to get like white to his face". Hearing Transcript, at 11. There was no mention of chest pain. Similarly, as noted above, Armand testified that "[h]is breathing was his major problem; shortness of breath, really. He couldn't do any physical exertion of any kind." Id. at 17. Again, there was no suggestion of chest pain or related heart problems. The ALJ simply ignored this testimony and relied completely upon the non-treating physician's unsupported conclusion that Mancia died of a heart attack.

In Hillibush, the ALJ ignored lay testimony describing the problems the miner had breathing, and his difficulty with exertion shortly before his death. We ruled that it was error for the ALJ to conclude that the miner died of a heart attack despite such lay testimony merely because of the unsubstantiated entry to that effect on the death certificate. We realize that the regulations in effect when we decided Hillibush specifically provided that the finding of causation in a survivor's claim should be made based upon a

17

consideration of "all relevant evidence." Id. at 202,10 while the current regulation is more restrictive. See 20 C.F.R. S 718.205(c). However, the change in the regulation does not allow the ALJ to ignore uncontradicted relevant lay testimony where it corroborates the medical testimony of a treating physician and is consistent with the medical records.

Indeed, the ALJ's only explanation of his rejection of Dr. Manganiello's conclusion that Mancia died because of his black lung disease is as follows:

> When one views Dr. Manganiello's "rationale" as expressed at his deposition it amounted to nothing more than the doctor assumed that the progressive subjective breathing symptoms were attributable to Black Lung, and that, therefore, when the miner was found dead that Black Lung must have contributed to his death. . . . The most reasonable observation to make is that Dr. Manganiello merely assumed that Black Lung played a part in death. His opinion is not well-reasoned or supported by any objective means and is not found to be based on "competent medical evidence." 20 C.F.R. S 718.205(c)(1)(2).

ALJ's Decision at 3.

However, Dr. Manganiello explained his "assumption" as follows:

I mean, the cause of death, as far as I am concerned,
is the contributing factor that made his heart stop; and
that is the antracosilicosis. Nowhere on that death
certificate does it state anything more than that.

* * *

The rational behind that was the fact that he had

_____

10. We stated that "30 U.S.C. S 932(b) (1982) required that [i]n
determining the validity of claims under this part, all relevant evidence
shall be considered, including where relevant, medical tests such as
blood gas studies, . . . [and] evidence submitted by the claimant's
physician, or his wife's affidavits, and in the case of a deceased miner,
other appropriate affidavits of persons with knowledge of the miner's
physical condition, and other supportive materials." Id. at 202.

18

ongoing problems related to his lung disease. And he
had ongoing symptoms revealing that he was
deteriorating from his lung condition. And he had no
other symptoms, and no other problems that would
cause his untimely death. Therefore, my rationale is
that it is his underlying lung disease that caused his
death.

Deposition Transcript, at 19.

D. THE STANDARD FOR EVALUATING
     MEDICAL TESTIMONY

In Kertesz v. Director, OWCP, 788 F.2d 158 (3d Cir.
1986), we discussed the general principles by which an ALJ
must evaluate medical evidence. We wrote:

    In reaching a decision, an ALJ should set out and
    discuss the pertinent medical evidence presented. The
    ALJ is not bound to accept the opinion or theory of any
    medical expert, but may weigh the medical evidence
    and draw its own inferences. Moreover, the ALJ should
    reject as insufficiently reasoned any medical opinion
    that reaches a conclusion contrary to objective clinical
    evidence without explanation.

    In weighing medical evidence to evaluate the
    reasoning and credibility of a medical expert, however,
    the ALJ may not exercise absolute discretion to credit
    and discredit the expert's medical evidence. [A]n ALJ is
    not free to set his own expertise against that of a

physician who presents competent evidence.

Id. at 163 (citations and internal quotations omitted). Moreover, "[a] testifying physician need not express his conclusions in terms of `reasonable degree of medical certainty' to be credited by the ALJ; the ALJ must instead accept a `documented opinion of a physician exercising reasoned medical judgment' ". Tennessee Consolidated Coal Co. v. Crisp, 866 F.2d 179, 185 (6th Cir. 1989).

Although an ALJ may properly reject a medical opinion "that does not adequately explain the basis for its conclusion," Risher v. OWCP, 940 F.2d 327, 331 (8th Cir. 1991); see also, Brazzalle v. Director, OWCP, 803 F.2d 934,

936 (8th Cir. 1986), the ALJ is not free to do so merely because he or she interprets the medical opinion as an assumption. The ALJ's rejection of Dr. Manganiello's opinion as an "assumption" imposes a requirement akin to a reasonable degree of medical certainty that is not required.11 In basing his opinion upon a single cryptic note and ignoring the contrary medical evidence (corroborated by uncontradicted lay testimony) that Mancia was not suffering from heart problems at the time of his death, the ALJ rejected a medical opinion that was consistent with, and corroborated by, the results of Mancia's pulmonary function exams, and his x-rays. Dr. Manganiello explained the basis of his conclusion that Mancia did not die of a heart attack. Based upon this record, the ALJ could not simply reject that reasoned assessment of the cause of Mancia's death by labeling it an "assumption."

The "assumption" which so concerned the ALJ was a hypothesis based upon Mancia's medical history, and Dr. Manganiello's treatment of Mancia during the 12 years leading up to his death. There is nothing inconsistent between such an "assumption", and reasoned medical judgment.

> Reasoned medical judgment has been defined in personal injury cases as a hypothesis representing a physician's professional judgment as to the most likely one among the possible causes of the physical condition involved. This definition has been accepted in litigation under the Black Lung Benefits Act.

Brazzalle v. Director, OWCP, 803 F.2d 934, 936 (8th Cir. 1986) (internal quotation marks and citations omitted).

_____

11. See Plesh v. Director, OWCP, 71 F.3d 103 (3rd Cir. 1995); Drummond Coal Co. v. Freeman, 733 F.2d 1523, 1526 (8th Cir. 1984) (reasoned medical judgment is all that is required, and opinions need not be expressed in terms of reasonable degree of medical certainty); Peabody Coal Co. v. Helms, 859 F.2d 486, 489 (7th Cir. 1988)(same). Although these, and other cases cited therein, address the"reasoned medical judgment" standard as it relates to the presumption that arises under 20 C.F.R. S 725.203(a)(4), we see no distinction between that standard and the "reasoned medical judgment" necessary to establish entitlement to survivor's benefits here.

Moreover, a physician's medical judgment, even if based on instinct, "is nonetheless grounded in years of experience" and has a "great deal of significance." Director, OWCP v. Mangifest, 826 F.2d at 1327. In Mangifest we stated

> [l]ike other judgments, a medical judgment is sometimes based upon instinct, the unarticulated and unarticulable opinion that is nonetheless grounded in years of experience. Apparently out of respect for this medical intuition, the regulations permit an ALJ tofind total disability on the basis of medical judgments even if the medical tests are inconclusive.

826 F.2d at 1327. In Mangifest, a miner seeking disability benefits submitted several reports from various physicians that did not meet the regulatory requirements for valid medical tests. We held that "a medical judgment contained in a noncomplying report may constitute substantial evidence of disability if, . . . it is reasoned and based on medically acceptable clinical and laboratory diagnostic technique. . . . The ALJ must base this determination on all the facts of the case." 826 F.2d at 1327. Here, although the ALJ questioned Manganiello's credibility regarding his explanation of the April 11 note, the ALJ did not doubt that Manganiello believed that Mancia died of pneumoconiosis. Rather, the ALJ rejected Manganiello's belief as a mere "assumption." However, that "assumption" was a medical opinion regarding his patient of 12 years, and is supported by Mancia's pneumoconiosis, and the lay testimony. Accordingly, it was not only unfair for the ALJ to disregard the treating physician's medical opinion as merely an "assumption," it was error to do so. Indeed, "assumptions" based upon a patient's medical history, and confirmed diagnosis can constitute the required "objective medical means" that the ALJ mistakenly concluded was lacking in this case. Moreover, the ALJ selectively labels Dr. Manganiello's opinion an "assumption" but does not explain why Dr. Candor's contrary opinion of the cause of Mancia's

death is not also an "assumption."

This case is unlike Lango v. Director, OWCP, 104 F.3d 573 (3d Cir. 1997), where the miner's treating physician merely made conclusory statements as to the miner's cause

of death. Here, Manganiello explained the basis for his opinion. With the exception of the April 11, 1991 note, Manganiello clearly, consistently and unwaveringly opined that the miner's chronic lung disease led to his deteriorating medical condition and, ultimately, to his death.

Moreover, and most importantly, the issue here is whether the pneumoconiosis that so gravely afflicted Mancia "even briefly" hastened his death. Lukosevicz, 888 F.2d at 1004. Thus, even assuming that Mancia did suffer a heart attack despite the absence of objective evidence that he did, the ALJ ignores Dr. Manganiello's uncontradicted testimony that Mancia's pneumoconiosis would still have hastened his death. Manganiello was asked a hypothetical question as to whether Mancia's underlying lung disease would have had any effect on his ability to survive a heart attack if he had suffered one. He responded:

> if someone had underlying heart disease and lung disease, as opposed to someone just having underlying heart disease and no lung disease; and if indeed they had a myocardial infarction, what would be your chances of surviving a myocardial infarction or a purely heart related death, given no lung disease, and then given the type of lung disease that Mr. Mancia had. And in that frame of reference, I believe that Mr. Mancia, given his significant lung diseases that we are talking about, I believe that he would have a much less chance of surviving a myocardial infarction or a heart-related death than another person without that type of disease. . . . But again, I don't believe that that relates to Mr. Mancia's case. And I don't believe Mr. Mancia suffered from any underlying heart disease; and I don't believe that he died of a myocardial infarction.

\* \* \*

> I believe that he would have a much more difficult time surviving a myocardial infarction, given his underlying lung disease, pneumoconiosis, to whatever degree. Just because he would be unable to sustain a good oxygenation of his heart. And further improvement of heart function, in the face of heart damage, would

require good stable lungs, good oxygenation to pull him through an event. Given his underlying lung condition, he would have a much more difficult time and run the higher risk of arrhythmias, skipped beats, and further deterioration of his heart, on the basis of his lungs not being able to keep up to an ongoing deterioration caused by an acute myocardial event.

Deposition Testimony, at 32-3. Manganiello added that his answer to the hypothetical would be the same if he assumed Mancia had a "totally disabling pneumoconiosis as determined by the Department of Labor" as if he had severe pneumoconiosis. Id. at 32. Manganiello's response is consistent with the regulations. 20 C.F.R. S 410.462(b) states:

> Where the evidence establishes that a deceased miner suffered from pneumoconiosis or a respirable disease and death may have been due to multiple causes, death will be found due to pneumoconiosis if it is not medically feasible to distinguish which disease caused death or specifically how much each disease contributed to causing death.

E. DR. CANDOR'S REPORT

Dr. Candor's report is the only medical conclusion consistent with the ALJ's finding that Mancia's death was not caused by complications related to his black lung disease. Absent that report, the record reflects only the ALJ's conclusion that Manganiello's opinion is not well reasoned, and the ALJ's concern that Manganiello's opinion is not corroborated by objective evidence. Accordingly, we examine Dr. Candor's report to determine if the ALJ's conclusion is properly supported by substantial evidence in the record.

As noted above, Dr. Candor was a non-treating physician who was hired by the Director to review the miner's medical records. In a different context, we have held that the opinion of a miner's treating physician "play[s] a major role in the determination of eligibility for black lung benefits." Schaaf v. Matthews, 574 F.2d 157, 160 (3d Cir. 1978); see also Lango v. Director, OWCP, 104 F.3d at 577 ("[T]he

treating physician's opinion merits consideration."). Nonetheless, "the opinion of a non-examining physician in a black lung case may in some circumstances have probative worth supporting substantial evidence," Evosevich v. Consolidation Coal Co., 789 F.2d 1021, 1028 (3d Cir. 1986).

In Evosevich, the coal company opposing the miner's black lung claim hired two physicians. One physician personally examined the miner and, on the basis of that examination, concluded that the miner was not disabled. The other physician hired by the company opposing the payment of benefits did not examine the miner but instead based his opinion that the miner was not disabled on the basis of his review of the records. The ALJ found that the opinions of both physicians were sufficient to rebut the interim presumption of disability under the applicable regulations. On appeal, the miner argued, inter alia, that the ALJ erred by according substantial weight to the opinion of the non-examining physician. We disagreed.

However, in Evosevich, the ALJ used the opinion of the non-examining physician to corroborate the opinion of the examining physician. Id. at 1028. He did not use it by itself to defeat the miner's claim. Although there may be situations where the nature of a non-treating physician's report is sufficient, in context with all the other evidence in the case, to support a conclusion that is contrary to the opinion of a treating physician, this is not such a case. Candor's report was the Director's case. See Hearing Transcript at 20 ("Your Honor, the Director relies on Dr. Candor's (sic) report, which states that pneumoconiosis, which Mr. Mancia did have, did not in any way contribute to or hasten his death.") (emphasis added).

In his report, Dr. Candor criticized Dr. Manganiello. Dr. Candor stated: "[d]espite Dr. Manganiello's statement in his letter of 4/11/91, I know of no scientific evidence which indicates that anthracosilicosis or emphysema hasten the progress of coronary artery disease." See P 3, Candor's Report. However, Dr. Manganiello testified in agreement with Dr. Candor thus further undermining the very document that Candor's report is based upon. During Manganiello's deposition, the following exchange occurred:

24

Q: Is coronary artery disease related to pneumoconiosis?

A: No, not really.

Q: So pneumoconiosis does not cause coronary artery disease?

A: No. It could be a risk factor, I would imagine. But, to my knowledge, no.

Id. at 28-29. Thus, both physicians agree that anthracosilicosis does not cause or contribute to coronary artery disease.

The ALJ rejected Dr. Manganiello's medical conclusion because it was not supported by objective evidence. Yet, the objective evidence on this record contradicts Candor's report. Dr. Candor's report states that his review of numerous x-rays "indicates a negative finding" for pneumoconiosis. He notes: "[a]lthough the chest x-ray of 9/20/82 was positive for simple pneumoconiosis, 12 the chest x-rays of 8/1/80, 12/21/88 and 2/21/89 were read negative for pneumoconiosis by separate and different B-readers. In addition the latest x-ray report (4/25/90) was read negative for pneumoconiosis by a field reader." Candor's Report at 1. Yet, as noted above, the Director concedes that Manganiello had pneumoconiosis. Moreover, our review of the x-ray reports in the record from the hearing before ALJ Dunau13 casts doubt upon Dr. Candor's review and his conclusion. The "Findings" on the report of the x-ray taken on 4/26/78 state: "1st stage anthracosilicosis with emphysema." That report is one of those Dr. Candor said he reviewed, but he suggests that the x-ray was negative despite the aforementioned

_____

12. Pneumoconiosis is customarily classified as"simple" or "complicated." Simple is caused by dust alone and is identified by small opacities in the lung fields visible on a chest x-ray. Complicated, which is generally more serious, involves progressive massive fibrosis as a complex reaction to dust and other factors. Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 7 (1976).

13. At oral argument, counsel for the Director informed the panel that the record of the proceedings before ALJ Dunau were incorporated into the record before ALJ Brown.

"conclusion." See Director's Exhibit No. 27. Similarly, a report of an x-ray taken on October, 22, 1986 states "[T]he lungs are hyperaerated and show a pattern compatible with chronic obstructive disease." See Director's Exhibit No. 19. Dr. Candor's report does not mention an x-ray taken on this date, though he does refer to one taken on October 26, 1986. We can not determine if one of these two dates is in

error, or if two x-rays were taken within 4 days of each other. In any event, the ALJ's opinion does not mention this discrepancy.

Even more glaring, however, is Dr. Candor's reference to a pulmonary function report "obtained on 9/30/82." Candor's Report at 1. Dr. Candor concludes that the pulmonary function values taken on that date "meet standard." However, the record contains the actual report of the test that was conducted on that date, by Dr. E.J. Biancarelli, and Dr. Biancarelli's conclusions about the report.[14] Dr. Biancarelli's note states:

> Mr. Mancia was examined by me on 9/30/82 at which time his ventilation studies were abnormal in all parameters. He became dyspneic doing them. His chest x-ray showed coal miner's pneumoconiosis, category 1/2Q. He had distant breath sounds as well as rales and wheezing upon physical examination.
>
> He is unable to lift, carry, walk uphill, upstairs or against the wind.

Directors Exhibit No. 22 (emphasis added).

ALJ Dunau noted that, although Dr. Candor reported that a pulmonary function study performed on September 30, 1980 was normal, the ALJ adjusted the study for Mancia's age, sex and height and concluded that "values obtained by Dr. Candor are below those set forth in the . . . regulations . . . as sufficient to establish total disability." ALJ Dunau's Decision and Order at 3-4. We cannot determine if ALJ Dunau's Decision and Order refers to a test performed on September 30, 1980 or if she erred and

_____

14. Mancia was referred to Dr. Biancarelli pursuant to his claim for miner's benefits, and Dr. Biancarelli conducted several tests on him on different occasions. See Transcript of Hearing Before ALJ Dunau, at 30.

was actually referring to the same September 30, 1982 test. In any event, Dr. Cander's report is at odds with the report of the physician who conducted the test on September 30, 1982, and ALJ Brown nevertheless accepted Cander's report without question.

Moreover, Dr. Candor's report in this survivor's claim is inconsistent on its face. Candor's report notes that he reviewed a valid arterial blood gas study that "indicated a supernormal arterial oxygen tension at rest which rose

further during exercise." Candor's Report at 2. Yet, Candor concludes in his report that the "normal arterial oxygen tension at rest and during exercise makes it most unlikely that the patient's chronic lung disease had any effect upon cardiac rhythm and function." Id. The ALJ credits this objective medical evidence and therefore apparently accepts Candor's conclusion that Mancia's ABG was both "supernormal" and normal at the same time, and that it rose further (above "supernormal") during exercise, and remained normal during exercise simultaneously.

Despite the fact that Candor's report states that he examined numerous records including x-rays and results of various examinations conducted upon Mancia over the years, his conclusion appears to rest solely upon Manganiello's April 11, 1991 note. At P 1 of his conclusions, Candor states:

> As noted in Dr. Manganiello's letter of 4/11/91, the immediate cause of Mr. Mancia's death on 8/5/90 was an acute myocardial infarction with resultant cardiopulmonary arrest. The myocardial infarction (heart attack) was caused by underlying coronary artery disease.

Candor's Report at 2. The only evidence in this record that Mancia died of a myocardial infarction was the 4/11/90 note written by Dr. Manganiello. Similarly, at P 3 of Candor's report he concludes:

> Despite Dr. Manganiello's statement in his letter of 4/11/91, I know of no scientific evidence which indicates that anthracosilicosis or emphysema hasten the progress of coronary artery disease.

27

Id. Dr. Cander assumed that Mancia died of a heart attack and that assumption influenced his opinion as to what, if any role, Mancia's underlying pneumoconiosis played in his death. Dr. Cander concludes in his report:

> The available information provides no evidence that Mr. Mancia's chronic lung disease was a substantially contributing cause to his death caused by acute myocardial infarction or hastened his death.

Id. However, the totality of the evidence does not support the conclusion that Mancia suffered a heart attack. The ALJ was not free to selectively credit testimony merely because it supports a particular conclusion while ignoring all evidence contrary to that conclusion.

The ALJ held that Manganiello's opinion was "not supported by objective means," yet he did not indicate what objective means he had in mind. Chest x-rays are used to determine the existence of pneumoconiosis, 20 C.F.R. S 718.202, and pulmonary function and blood gas studies are used to determine the degree of a miner's level of disability caused by pneumoconiosis. 20 C.F.R. S 708.204(c)(1) and (2). None of these objective means would have been necessary because of the Director's concession that the miner was disabled because of his pneumoconiosis arising out of his coal mine employment. Furthermore, it would have been unnecessarily cruel to subject the miner to further unnecessary pulmonary function and blood gas studies because both tests can be very painful to a miner already diagnosed as having pneumoconiosis. See, OFFICE OF ADMINISTRATIVE LAW JUDGES, JUDGES' BENCHBOOK OF BLACK LUNG BENEFITSACT, U.S. DEP'T OF LABOR, Chapter 2: Introduction to Medical Evidence, January, 1997.15 Finally, and most importantly, these tests are conducted on living miners and would not be at all helpful in answering the critical question here, i.e., did pneumoconiosis cause or substantially contribute to the miner's death.

An autopsy was not performed. However, the ALJ did not

_____

15. Available electronically at http://204.245.136.2/public/blalung/refmc/bbb2.htm.

find, and the Director does not contend, that an autopsy is the only acceptable way to determine whether a miner's lung disease caused his death. We will not require one in cases like this by concluding that Josephine Mancia has not met her burden of proof.

In sum, we do not believe that this record contains that quantum of evidence that a reasonable mind wouldfind necessary to support ALJ Brown's rejection of Dr. Manganiello's opinion that Mancia's black lung disease hastened his death. Kowalchick.

V.

In his brief, counsel for Josephine Mancia requests that we do not remand for further proceedings but that we remand to the Board with a direction to award her survivor's benefits based, inter alia, on her age and the protracted history of her case. See Appellant's Br. at 17.

However, at oral argument, counsel merely requested a remand to the ALJ for further proceedings. Mrs. Mancia's claim for survivor's benefits has been making its way through the administrative process for seven years and she is now 78 years old. We have previously expressed our concern over the "dismaying inefficiency" of the black lung administrative process. Lango v. Director, OWCP, 104 F.3d at 575-576. Nonetheless, we cannot award black lung benefits solely because of protracted administrative delay. Id. at 576.

However, we can direct an award of benefits where the "result is foreordained." Caprini v. Director, OWCP, 824 F.2d 283, 285 (3d Cir. 1987). Perhaps the clearest example of a foreordained result is Keating v. Director, OWCP , 71 F.3d 1118, 1123-1125 (3d Cir. 1995), where we found that a remand for further proceedings would serve no useful purpose because the Director conceded the credibility of the claimant's witnesses and had no contrary evidence. Under those circumstances, we reviewed the evidence and found that the miner's widow was entitled to survivor's benefits.

We have also declined to remand for further proceedings and have directed an award of benefits where the result was not as readily apparent as Keating. In Sulyma v.

29

Director, OWCP, 827 F.2d 922 (3d Cir. 1987), the Director conceded that the miner raised the interim presumption of disability under the applicable regulation. Id. at 923-924. However, the Director, although conceding that supplemental medical evidence would not be produced on remand, nonetheless requested a remand so that the ALJ could further interpret the evidence to determine if the Director's evidence was sufficient to rebut the interim presumption. Id. at 924. Because the Director had no further rebuttal evidence to produce on a remand, we reviewed the Director's medical evidence offered in rebuttal and concluded that it was insufficient to rebut the interim presumption. Id. at 924. Accordingly, "[i]n view of the absence of rebuttal evidence," we found that a remand for further proceedings was unwarranted, and, therefore, directed an award of benefits. Id.

We followed the Sulyma rationale in Kowalchick, where the Director, although having no further rebuttal evidence to produce on a remand, nonetheless requested a remand for further proceedings. Once again, we reviewed the medical evidence the Director offered to rebut the interim presumption of disability and found it insufficient to rebut the presumption. Therefore, because we found the rebuttal

evidence insufficient, we found remand unnecessary and instead directed an award of benefits. In Kowalchick we expanded upon our Caprini statement that we can direct an award of benefits where the result is foreordained. While acknowledging that a remand is necessary where the record supports conflicting inferences, we found that an award of benefits is appropriate where the record supports only one conclusion. Kowalchick v. Director, OWCP, 893 F.2d at 624.

We believe that the record here supports only one conclusion, i.e., that Josephine Mancia met her burden of establishing that contributed to her husband's death. With the exception of Manganiello's April 11, 1991 note, Josephine Mancia's medical evidence clearly, consistently and unwaveringly demonstrated that the miner's death was caused by his lung disease. Manganiello's medical opinion as to the miner's cause of death was well-reasoned, supported by objective means and based on competent medical evidence. Moreover, even assuming that Mancia

30

died of a heart attack as stated in the April 11th note, the record is uncontradicted to that his lung disease would still have hastened his death.

The Director's medical evidence was, contradictory and inconsistent with Mancia's medical history. We find that Josephone Mancia has demonstrated her entitlement to survivor's benefits as a matter of law. Thus, we will direct an award of survivor's benefits from the applicable date.

Although this will not be appropriate in every case it is appropriate on this record. It is also consistent with the policy of the Department of Labor's Part 718 regulations, which recognizes that hardships can befall a miner's survivor when a black lung disability benefits are terminated because of the miner's death. The applicable regulation provides not only that a claim for survivor's benefits shall be adjudicated on an "expedited basis," but also that where the "initial medical evidence appears to establish that death was due to pneumoconiosis, the survivor will receive benefits unless the weight of the evidence as subsequently developed by the Director .. . establishes that the miner's death was not due to pneumoconiosis . . . ." 20 C.F.R. S 718.205(d).

VI.

Accordingly, we will grant the petition for review, reverse the decision of the Board and remand for the limited purpose of awarding survivor's benefits in accordance with

20 C.F.R. S 725.503(c). Because Mrs. Mancia has been litigating this claim for seven years and because she is 78 years old, we urge the BRB to expedite this award so that survivor's benefits will begin as soon as possible.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

31