

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-30-2004

# Soubik v. Director OWCP

Precedential or Non-Precedential: Precedential

Docket No. 03-1668

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Soubik v. Director OWCP" (2004). *2004 Decisions.* Paper 732.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/732

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

———

No. 03-1668

———

JOHN A. SOUBIK, Executor of the
Estate
of Cecilia Soubik,

Petitioner

v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS,
United States Department of Labor

———

On Appeal from the Benefits Review
Board, U.S. Department of Labor
(BRB No. 02-0251 BLA)

———

Argued December 18, 2003

BEFORE: ROTH and McKEE, <u>Circuit
Judges</u>, and CUDAHY[*], <u>Senior Circuit
Judge</u>.

(Filed April 30, 2004)

———

[*] Honorable Richard D. Cudahy, U.S.
Court of Appeals for the Seventh Circuit,
sitting by designation.

Neil A. Grover, Esq. (Argued)
Law Office of Neil A. Grover
2201 N. Second Street
Harrisburg, PA 17110
<u>Counsel for Appellant</u>

Sarah M. Hurley, Esq. (Argued)
Howard M. Radzely
Donald S. Shire
Patricia M. Nece
U.S. Department of Labor
Office of the Solicitor
Suite N-2117
200 Constitution Ave., N.W.
Washington, D.C. 20210
<u>Counsel for Appellee</u>

———

OPINION

———

McKEE, <u>Circuit Judge</u>.

The widow of a deceased coal
miner[1] returns to this court to appeal the
Benefits Review Board's third denial of
her claim for survivor's benefits under the
Black Lung Benefits Act ("BLBA"), 30
U.S.C. §§ 901-945. She claims that the
ALJ did not properly weigh the lay and
medical evidence on remand following our
earlier decision, *Soubik v. Office of
Workers' Compensation Programs*, No.

———

[1] Widow Cecilia Soubik died after
filing her appeal in this case. The executor
of Mrs. Soubik's estate, John A. Soubik,
was substituted as the appellant on
February 5, 2004.

98-6338 (3d Cir. June 25, 1999) ("*Soubik I*"), and that the Board should not have affirmed the ALJ's decision. For the reasons that follow, we will once again reverse and remand.

## I.

After mining and hauling coal for nearly 50 years, Michael Soubik filed a claim under the BLBA in August 1980. The claim stated that Soubik could no longer work because he was short-winded and had difficulty climbing stairs. The Office of Workers' Compensation Programs (OWCP) denied his claim in July 1981. He requested a hearing in 1982 after being notified that the denial of benefits had been reaffirmed, and a hearing was held before an ALJ in 1986. He died shortly after the hearing. Dr. Jere Wagner, one of his treating physicians, signed a death certificate that listed acute myocardial infarction as the cause of death. In 1987, an ALJ again denied his application for benefits. Although the OWCP had stipulated that Mr. Soubik suffered from coal miners' pneumoconiosis,[2] the ALJ concluded that

the pneumoconiosis had neither substantially contributed to, nor hastened, Soubik's death as required for BLBA benefits. The BRB affirmed in 1988.

In 1986, while her husband's claim was still being litigated, Cecilia Soubik filed her claim for survivor benefits under the BLBA. The OWCP administratively denied her claim on February 2, 1987, and Mrs. Soubik requested a hearing before an ALJ three days later. The claim was then referred to another ALJ, who found that the only remaining question was whether pneumoconiosis substantially contributed to, or hastened, her husband's death.

---

"Clinical pneumoconiosis" consists of those diseases recognized by the medical community as pneumoconioses, i.e., the conditions characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment. This definition includes, but is not limited to, coal workers' pneumoconiosis, anthracosilicosis, anthracosis, anthrosilicosis, massive pulmonary fibrosis, silicosis or silicotuberculosis, arising out of coal mine employment.

. . .

"Legal pneumoconiosis" includes any chronic lung disease or impairment and its sequelae arising out of coal mine employment. This definition includes, but is not limited to, any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment.

---

[2] Under 20 C.F.R. § 718.201, pneumoconiosis is defined as:

a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment. This definition includes both medical, or "clinical", pneumoconiosis and statutory, or "legal", pneumoconiosis.

. . .

However, this ALJ concluded that he was bound by the original ALJ's determination that pneumoconiosis did not hasten Mr. Soubik's death. Accordingly, the second ALJ denied Mrs. Soubik's claim for survivor's benefits.

In December 1989, Mrs. Soubik appealed to the BRB. It affirmed the ALJ's decision denying her benefits in March 1991, and denied her motion to reconsider its decision in October 1991.[3] Mrs. Soubik then submitted a request for modification of the BRB's decision to OWCP,[4] which denied it in April 1992.

Over five years later in 1997, OWCP granted Mrs. Soubik's request for another hearing before an ALJ. That July, an ALJ denied Mrs. Soubik's claim. Mrs. Soubik appealed to the BRB, but it denied her appeal on July 28, 1998. She then filed a petition for review in this court. We reversed the BRB's affirmance of the ALJ's decision in *Soubik I* and remanded the case back to the BRB.

Two years later, in June 2001, the

---

[3] Mrs. Soubik and her son sent a letter to the BRB appealing its affirmation of the ALJ's decision, and the BRB deemed this letter a motion for reconsideration.

[4] Mrs. Soubik wrote to OWCP stating that she understood she needed to go to federal court so she could submit additional evidence to continue the claim, and OWCP treated her correspondence as a request for modification of the BRB's decision.

BRB remanded the case to an ALJ for proceedings consistent with *Soubik I*. That ALJ again denied Mrs. Soubik benefits. The BRB affirmed and this petition for review followed.

## A. Evidence before the third ALJ in 1997

The third ALJ had before him the medical opinions of three doctors as well as the lay opinions of Mr. Soubik's friends and family. This evidence is summarized below.

### 1. Medical opinions

#### a. Dr. Karlavage

Dr. Karlavage, who was board-certified in family practice and dedicated about 40 percent of his practice to treating coal miners and former coal miners for pulmonary problems, treated Mr. Soubik from October 1985 until his death in April 1986. During that six-month period, Soubik had three office visits. In his 1986 deposition, Dr. Karlavage stated that he was aware of Soubik's three pulmonary function tests ("PFTs"). He stated that the 1981 PFT was abnormal, the 1985 PFT was normal, and the 1986 PFT was "essentially normal" because it had some normal readings although one reading was "consistent with obstructive lung disease at 29 percent." Dr. Karlavage also stated in his deposition that an x-ray from 1981 indicated anthracosilicosis and one from 1985 indicated "pneumoconiosis uncomplicated."

Based on his examinations of Soubik, his review of Soubik's medical

and occupational history, and the medical tests he ran, Dr. Karlavage concluded that Soubik "had lung disease best described as pneumoconiosis and I think did have coronary artery disease." He concluded that the pneumoconiosis was caused by Soubik's "exposure over a several decade period. . . to silica, rock, and coal dusts." He reconciled the variable results from the three PFTs with his conclusion that Soubik's death was substantially related to his pneumoconiosis, stating that Soubik:

> has a chest x-ray that does indicate pneumoconiosis. His physical examination revealed, in my opinion, some lung disease. There is variability among pulmonary function tests that certainly does occur. . . . [P]ulmonary function tests can and do change from month to month and from year to year. So, he was apparently breathing a little bit better more recently.

He also noted a contrary negative reading of one of the chest x-rays indicating that Soubik did not have pneumoconiosis. However, he explained that result by noting the "obvious discrepancies" in the doctor's report who read the chest x-ray as normal. That doctor also claimed that the results of a PFT that was taken at the same time as this x-ray were abnormal. Dr. Karlavage also discounted the significance of the normal PFT in 1985 because the doctor who conducted that test did not account for the medication Soubik was taking and the effect it would have had on the PFT.

In February 1995, Dr. Karlavage wrote a letter to Mrs. Soubik's attorney. It stated in relevant part:

> During that time [in which I took care of Mr. Soubik], I had the opportunity to review a positive chest x-ray and an abnormal pulmonary function test. As you are aware, Mr. Soubik expired when he was 74 years old at the Shamokin Hospital. The patient's death certificate indicates arteriosclerotic heart disease but on further inquiry, the family has discovered directly from the attending physician, that coal worker's pneumoconiosis was involved in his death. (sic)
>
> . . .
>
> In conclusion, it is my opinion, as it was before, that . . . the patient's death was substantially incurred due to coal worker's pneumoconiosis. Indeed, he had arteriosclerotic heart disease and nerve block, but there is no doubt in my mind that coal worker's pneumoconiosis weakened him, worsened his

4

condition, and speeded his death.

### b. Dr. Wagner

Dr. Wagner treated Mr. Soubik for his heart condition from May 1984 until Soubik's death, and signed Soubik's death certificate.[5] Soubik's death certificate listed his cause of death as acute myocardial infarction with complete heart block and included cardiogenic shock under "other significant conditions." Dr. Wagner was unaware that Soubik had also been treated by Dr. Karlavage when he signed the certificate. Nine years after Soubik died, Dr. Wagner wrote a letter in response to an inquiry from Mrs. Soubik. The letter stated that, after reviewing Dr. Karlavage's medical records including pulmonary function studies and x-ray findings, Dr. Wagner concluded that Soubik's pulmonary impairment secondary to his pneumoconiosis "could have contributed" to the miner's cardiac condition and subsequent death.

### c. Dr. Spagnolo

The OWCP had Dr. Spagnolo, who was board-certified in internal medicine and pulmonary diseases, review Mr. Soubik's medical history. That history included the PFTs from 1981, 1985, and 1986; two blood gas tests; and two chest x-ray readings. Based on his review of Soubik's history, Dr. Spagnolo concluded that pneumoconiosis was not a substantially contributing factor to Soubik's death, and that there was no reasonable evidence that the miner's death was caused by complications of pneumoconiosis.

Dr. Spagnolo gave no weight to Dr. Karlavage's medical opinion to the contrary because Spagnolo believed that Karlavage had not adequately explained the normal results of the pulmonary function tests from 1985 and 1986.[6] He also gave no weight to Dr. Wagner's opinion because it was based on Dr. Karlavage's records and also failed to explain the normal pulmonary function test results.

Dr. Spagnolo concluded that:

> the medical record in my opinion provides little evidence for the presence of a pneumoconiosis. In fact, the only B-reader report[7]

---

[5] Unlike the other two doctors whose opinions were in the record, Dr. Wagner's credentials were not specified.

[6] As noted above, that is simply not true. Dr. Karlavage explained the normal results in 1985 by factoring in the effect of Soubik's medication.

[7] A "B-reader" is a person with a significant level of qualification for reading x-rays, and this court has given B-readers' x-ray readings greater weight than readings by less qualified personnel. *See Labelle Processing Co. v. Swarrow,* 72 F.3d 308, 310 n.3 (3d Cir. 1995). Only one of the people reading one of Mr.

indicates no evidence of coal workers' pneumoconiosis. Nevertheless, assuming that a pneumoconiosis was present in Mr. Soubik, his lung function in 1985 and again in March 1986 shortly before his death was normal. The normal arterial blood gas results in 1985 provide further support for the conclusion that Mr. Soubik had normal lung function. Thus, this medical record does not provide reliable evidence of a clinically significant impairment of lung function or evidence of progression of any lung problem at the time of his death. Therefore, even if Mr. Soubik had a pneumoconiosis, it did not result in a clinically significant impairment of his heart or lung.

---

Soubik's chest x-rays was a B-reader. He concluded that Soubik's x-ray did not indicate pneumoconiosis.

. . .

In summary, . . . Mr. Soubik's death was not caused by a pneumoconiosis. A pneumoconiosis was not a substantially contributing factor leading to his death and there is no reasonable evidence (including a well reasoned medical opinion) that his death was caused by complications of pneumoconiosis.

### 2. Lay evidence

There were lay opinions in the record from Mr. Soubik himself as well as Mrs. Soubik; Walter Koshinskie, their neighbor and Mr. Soubik's co-worker; John Soubik, the Soubiks' son; Frank Alberts, Mr. Soubik's brother-in-law; and Adeline Cecilia Dilliplane, the Soubiks' daughter's mother-in-law.

#### a. Mr. Soubik

Mr. Soubik testified that he had suffered difficulty breathing and shortness of breath for "the last 15 years and as the years progress, it is getting more and more." He stated that if he walked a city block he would have to stop; that if he had to walk up or down steps, he had to stop several times; and that he coughed up black mucus at night. He also testified that he took Brondicon for his breathing and nitroglycerin for his heart. He retired completely in 1983 due to his breathing

problems, had a heart attack in 1984, and never smoked.

### b. Mrs. Soubik

Mrs. Soubik testified during the 1989 hearing on her survivor claim. She also stated that her husband took Brondicon for his black lung problem. She stated that it "sort of loosened up his phlegm [so] that he had to spit up." She also testified that he took medication for his heart after having a heart attack in 1986, shortly before his death. The day he died, he became short of breath and was taken to the hospital where he was put in an oxygen tent. He stayed in the tent until he died.

She also testified during the 1997 hearing that she personally observed her husband's breathing difficulty for "a long period of time" before his death. Even after he retired from work and started receiving Social Security disability benefits, he would breathe heavily and spit up blood and mucus every day. The problem was particularly pronounced in the evening. She also saw that, just before his death, he could barely walk and was very weak.[8]

### c. Walter Koshinskie

Koshinskie testified at the 1989 hearing that he had known Mr. Soubik for forty years.[9] Soubik had hauled coal for him, and their homes were close to each other on the same street. He noticed that Soubik's health was slipping because Soubik could not walk well or walk up stairs because it would "take his wind." The day that Soubik died, Koshinskie noticed that he was winded from walking outside.

### d. John Soubik

John Soubik testified at the 1997 hearing that every time he came home to visit his parents, he could see his father's condition had deteriorated. He observed that his father had "considerably slowed down," and heard him make "gasps for air" and have a "trying to catch his breath feeling." He also saw his father raise his chest "like he was trying to get air," and "hold[] on to the bannister a lot going down the stairs." John Soubik also took his father to the hospital where he was "hooked. . . up to that breathing apparatus."

### e. Frank Alberts

Alberts testified at the 1997 hearing that he had known Mr. Soubik, his brother-in-law, for about 50 years at the time of Soubik's death in 1986. Alberts had

---

[8] Mrs. Soubik also testified that her brother died of pneumoconiosis, i.e. black lung disease, and that she had seen her brother daily for about 20 years before his death. But this testimony is never linked to any observations she made of her husband's illness.

[9] He also testified at the April 1986 hearing on Mr. Soubik's claim, but that testimony focused on establishing that Soubik had worked as a coal miner and hauler.

worked with him for about a decade starting in the mid-1930s. He "could see [Soubik] gradually slowing down. . . over a period of years" and "could see his breathing was getting slower. . . and he'd have to fight for his breath" starting in about 1974 or 1975. He saw Soubik have trouble catching his breath "pretty regular." Periodically, he saw him coughing or spitting when they would visit. He noticed that Soubik had trouble going up the steps in his house as he got older.

### f. Adeline Cecilia Dilliplane

Ms. Dilliplane had known Mr. Soubik since 1969 when her son married the Soubiks' daughter. She stated that Mr. Soubik had trouble helping her son build a house. "[H]e would do some things and then he would stop because he'd start wheezing. He'd start coughing." She said that she thought he had breathing problems comparable to hers, and she had serious problems with asthma. Over time, they saw each other less often but regularly. During visits she would hear him wheeze and "knew he was having a bad. . . breathing problem."

### B. The ALJ's 1997 Decision

The ALJ's 1997 decision denying benefits was based on Dr. Spagnolo's opinion. The ALJ discounted Dr. Wagner's opinion as too vague, and he discounted Dr. Karlavage's opinion because it was based on "the report of the miner's relatives that pneumoconiosis was involved in the miner's death" as Dr. Wagner had conveyed to them. The ALJ

noted that Mrs. Soubik and "the miner's sons and sister-in-law" had testified that Mr. Soubik had become short of breath over time, but he did not discuss that evidence.

### C. *Soubik I*

In *Soubik I*, we reversed the BRB's decision affirming the ALJ's denial of benefits, and we remanded for "further consideration of the lay evidence." We agreed with the ALJ that the only dispute was causation. Accordingly, Mrs. Soubik had to establish that Mr. Soubik's death was due to pneumoconiosis, i.e., that pneumoconiosis "was a substantially contributing cause or factor" leading to her husband's death or that his "death was caused by complications of pneumoconiosis" under 20 C.F.R. § 718.205(c).[10] We also concluded that Mrs. Soubik could prove her claim using "medical evidence alone, non-medical evidence alone, or the combination of medical and non-medical evidence" under *Hillibush v. Dep't of Labor*, 853 F.2d 197, 205 (3d Cir. 1988). *Hillibush* explicitly held that lay testimony must be considered in a survivor's case under 20 C.F.R. § 718.204.

In the case at hand, we held in *Soubik I* that neither the ALJ nor the BRB

---

[10] In *Lukosevicz v. Director, OWCP*, 888 F.2d 1001, 1004, 1006 (3d Cir. 1989), we held that if the pneumoconiosis hastens death, even briefly, it can be considered a substantially contributing cause of death under 20 C.F.R. § 718.205(c).

had given any consideration to the lay evidence offered in support of Mrs. Soubik's claim, and this evidence "could be enough to satisfy Mrs. Soubik's burden of proof that pneumoconiosis hastened her husband's death." We also noted that the ALJ and BRB had relied heavily on the opinion of Dr. Spagnolo, and that he had formed his opinion "based on his review of Soubik's medical history" rather than the opinions of Soubik's treating physicians, Dr. Karlavage and Dr. Wagner.

## D. The ALJ's 2001 Decision on Remand

Upon remand from *Soubik I*, the ALJ summarized the lay testimony in the record. He found that the lay opinions did not clearly establish that Mr. Soubik's ongoing deterioration was due to pneumoconiosis or a pulmonary condition. He also discussed each of the three doctors' opinions again, and reached the same conclusion, that Dr. Spagnolo's opinion was the most persuasive.

The ALJ again found that Dr. Wagner's opinion was "equivocal and vague" because he merely stated that the pneumoconiosis "could have contributed" to the miner's death, as he had in 1997. He also found that Dr. Karlavage's opinion was "not well documented nor well reasoned" because "he did not discuss the basis for [his] conclusion [that the miner was totally disabled from coal mine employment due to his lung disease] given his own deposition testimony that the miner's pulmonary function study results from studies taken in 1985 and 1986 were normal." He also stated that Dr.

Karlavage's February 22, 1995 letter established that the doctor "bases his conclusions regarding the cause of the miner's death, in part, . . . only on statements from the miner's relatives."

The ALJ concluded that Dr. Spagnolo's opinion would outweigh the other doctors' opinions even if they could establish that pneumoconiosis hastened Soubik's death because of Dr. Spagnolo's superior credentials and because "Dr. Wagner. . . did not treat the miner for respiratory problems and Dr. Karlavage only saw the miner on three office visits over a six month period." The ALJ believed that the lay testimony was also outweighed by "the thorough and complete report of Dr. Spagnolo." The ALJ described Dr. Spagnolo as both "[a] highly qualified. . . pulmonary specialist" as well as the beneficiary of a complete review of Soubik's medical records. The ALJ thus concluded that Mrs. Soubik did not establish pneumoconiosis was a substantially contributing factor in her husband's death or that it hastened his death, and he therefore denied survivor's benefits.

## II. Standard of Review

Because the BRB adopted the ALJ's factual findings, we independently review the entire record to determine if the ALJ's factual findings are rational, consistent with applicable law, and supported by substantial evidence on the record considered as a whole. *See Mancia v. Director, OWCP*, 130 F.3d 579, 584 (3d Cir. 1997) (citing *Kowalchick v. Director,*

9

*OWCP*, 893 F.2d 615, 619 (3d Cir. 1990)). Substantial evidence has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* We exercise plenary review over the ALJ's legal conclusions adopted by the BRB. *Id.*; *see also Carozza v. U.S. Steel Corp.*, 727 F.2d 74, 77 (3d Cir. 1984).

## III. Discussion

Mrs. Soubik argues that the ALJ did not follow *Soubik I* on remand because he failed to properly weigh the lay evidence in the context of the evidence as a whole. She also argues that the ALJ did not properly consider the opinions of Dr. Karlavage and Dr. Wagner. Finally, assuming we find these arguments meritorious, she requests that we grant her BLBA benefits rather than remanding and reversing.

### A. Weighing the lay evidence

The ALJ did consider the lay evidence on remand per our instructions in *Soubik I*. His opinion summarized what each layperson said and analyzed its probative value. The ALJ noted that each of the lay witnesses established that Mr. Soubik was having trouble breathing, noticed that Mr. Soubik had increased trouble with his breathing over time, and observed his frequent coughing and spitting up mucus and/or blood. He then explained his rationale for rejecting the lay evidence. According to the ALJ, the lay evidence that Mr. Soubik had breathing trouble did not establish that pneumoconiosis was responsible for, or a

contributing factor to, Soubik's breathing impairment. The ALJ concluded that Dr. Spagnolo's opinion regarding the cause of Mr. Soubik's breathing problems was more persuasive than these lay opinions.

### B. Weighing the medical evidence

Although the lay evidence alone did not offer an etiology of Mr. Soubik's breathing troubles,[11] the ALJ improperly minimized its significance in weighing Dr. Spagnolo's opinion and Dr. Karlavage's contrary opinion. Mrs. Soubik argues that this was error because Dr. Spagnolo's conclusion that no pneumoconiosis was present contradicted the parties' stipulation to the contrary. She also argues that the ALJ erred in discounting Dr. Karlavage's opinion and that he misunderstood the basis of that opinion.[12]

---

[11] The ALJ could hardly expect lay testimony to establish causation or etiology. That is beyond the purview or the competence of lay witnesses. Such testimony can only be expected to corroborate certain symptoms and establish pertinent behavior or quality of life issues. Expert testimony will usually be required to establish the necessary relationship between such observed indicia of pneumoconiosis and any underlying pathology.

[12] Mrs. Soubik also argues that the ALJ improperly disregarded Dr. Wagner's opinion because it was conditional. As noted above, his opinion stated that pneumoconiosis "could" have contributed to Mr. Soubik's death. She cites to *Piney*

10

In *Soubik I* we noted that the ALJ "relied heavily" on Dr. Spagnolo's opinion, and that opinion was based solely on a review of Soubik's medical history. Dr. Spagnolo never saw Mr. Soubik. We thus raised the ALJ's reliance on Dr. Spagnolo's opinion as an issue, but did not definitively state that the ALJ had incorrectly relied on it. Accordingly, there is no law of the case regarding the doctors' opinions.

The Court of Appeals for the Fourth Circuit has held that an ALJ may not credit a medical opinion stating that a claimant did not suffer from pneumoconiosis causing respiratory disability after the ALJ had already accepted the presence of pneumoconiosis unless the ALJ stated "specific and persuasive reasons" why he

_____

*Mountain Coal Co. v. Mays*, 176 F.3d 753, 763 (4th Cir. 1999). In *Piney Mountain*, the court evaluated a medical opinion that stated that "pneumoconiosis could be considered a complicating factor" in the miner's death. The court held only that such an opinion need not be rejected, as the petitioner argued, stating that "a reasoned medical opinion is not rendered a nullity because it acknowledges the limits of reasoned medical opinions." *Id*. However, the court also recognized that "uncertainty is not proof, and claimants must prove entitlement." *Id*. Accordingly, under *Piney Mountain*, the ALJ was free to minimize the probative value of Dr. Wagner's conditional opinion but he did not have to reject it solely because it appeared to be equivocal.

or she relied upon such an opinion. *Scott v. Mason Coal Co.*, 289 F.3d 263, 269 (4th Cir. 2002) (internal citation omitted). Like the medical opinion in *Scott*, Dr. Spagnolo's expert opinion states that Soubik did not have pneumoconiosis despite the parties' agreement that he did. Dr. Spagnolo's opinion can be distinguished from the opinion in *Scott* because he stated that even if Soubik had pneumoconiosis, there is still no evidence that it contributed to his death. However, that superficial "hypothetical" does not reconcile his opinion with the stipulation that pneumoconiosis was present. Common sense suggests that it is usually exceedingly difficult for a doctor to properly assess the contribution, if any, of pneumoconiosis to a miner's death if he/she does not believe it was present. The ALJ did not explain why Dr. Spagnolo's opinion was entitled to such controlling weight despite Dr. Spagnolo's conclusion that Soubik did not have the disease that both parties agreed was present.

Moreover, on remand, the ALJ obviously misunderstood how Dr. Karlavage arrived at his opinion and this contributed to his improper discounting of Dr. Karlavage's conclusion. The ALJ cited part of Dr. Karlavage's letter to Mrs. Soubik's counsel, which stated: "The patient's death certificate indicates arteriosclerotic heart disease but on further inquiry, the family has discovered directly from the attending physician, that coal worker's pneumoconiosis was involved in his death." The ALJ then concludes that,

11

since Dr. Karlavage based his opinion that pneumoconiosis contributed to Soubik's death on information from Soubik's family, Dr. Karlavage's opinion was not well-reasoned nor well-documented.

That conclusion is not supported by substantial evidence. In fact, it is flatly contradicted by Dr. Karlavage's 1986 deposition, which was part of the record from Mrs. Soubik's earlier hearings before other ALJs. The deposition details Dr. Karlavage's examination and analysis of three PFTs, the same two chest x-rays that Dr. Spagnolo relied on, and his own personal observations of the patient. Based on this information, Dr. Karlavage opined in 1986 that Soubik's pneumoconiosis advanced his death. The language in Dr. Wagner's 1995 letter, written nine years after he issued his initial opinion regarding the factors contributing to Soubik's death, indicates only that Dr. Wagner later amended his opinion to say that pneumoconiosis could have contributed to Soubik's death after he reviewed Dr. Karlavage's records and opinion. Dr. Karlavage's opinion was based on much more than just the family's opinion that pneumoconiosis hastened Soubik's death. It was therefore irrational for the ALJ to discount Dr. Karlavage's opinion merely because it refers to Dr. Wagner's 1995 letter.

It was also improper for the ALJ to assume that Dr. Karlavage's consideration of information from Mr. Soubik's family and others who had observed him regularly was a failing. The ALJ did not explain that assumption. He stated only that the lay evidence standing alone does not provide support for the theory that pneumoconiosis hastened or caused Mr. Soubik's death. He does not explain why he assumed that Dr. Karlavage's opinion would be worth less than Dr. Spagnolo's because Dr. Karlavage took such information into account when forming his opinion. Indeed, it seems that Dr. Karlavage's opinion would be stronger because it factored in the lay observations of those who knew Mr. Soubik.[13]

---

[13] Moreover, at oral argument the government conceded that Dr. Spagnolo might have come to a different result if he had the benefit of the lay evidence. As noted above, Dr. Spagnolo concluded that there was no "reliable evidence of a clinically significant impairment of lung function or evidence of progression of any lung problem at the time of his death." Yet it is clear from the testimony of those who knew Soubik that he was having an increasingly difficult time breathing and regularly coughed up mucus. Moreover, the testimony of those who knew Soubik also established that he was placed in an oxygen tent when last admitted to the hospital and that he never recovered. The ALJ never explained why testimony as compelling as this can be ignored in favor of a doctor who opined that Soubik had no "clinically significant" lung problems. This is especially true when that doctor never saw the patient, and all but ignored the fact that parties are assuming that pneumoconiosis was present given their stipulation on this point.

The ALJ also failed to give Dr. Karlavage's opinion the additional deference it was due as the opinion of a treating physician. The ALJ stated that he did not credit Dr. Karlavage's opinion as that of a treating physician because Dr. Karlavage had only seen Soubik three times over six months. That was, of course, three more times and six months more than Dr. Spagnolo saw him. So easily minimizing a treating physician's opinion in favor of a physician who has never laid eyes on the patient is not only indefensible on this record, it suggests an inappropriate predisposition to deny benefits. It is well-established in this circuit that treating physicians' opinions are assumed to be more valuable than those of non-treating physicians. *Mancia v. Director, OWCP*, 130 F.3d 579, 590-91 (3d Cir. 1997). The ALJ nevertheless ignored Dr. Karlavage's clinical expertise; an expertise derived from many years of diagnosing and treating coal miners' pulmonary problems. The ALJ did so without making any effort to explain why Dr. Spagnolo's board certification in pulmonary medicine was a more compelling credential than Dr. Karlavage's many years of "hands on" clinical training.

## C. Directing BLBA benefits

We turn to the final issue that Mrs. Soubik raises. She asks us to remand this case to the BRB solely to direct entry of an award of benefits based on the inordinate delay in properly adjudicating her claim. She argues that allowing her claim to drag on any longer would be unfair and inappropriate because she would certainly be granted compensation upon remand.[14]

We agree that this litigation has been unnecessarily protracted. We have previously expressed our frustration over the inefficiency and delay that is all too often part of the black lung administrative process. We have done so in a case where a claimant had been litigating her claim for benefits for seven years, ten fewer years than Mrs. Soubik. *Mancia*, 130 F.3d at 593 (internal citation omitted). In *Mancia*, we quoted our decision in *Lango v. Director, OWCP*, 104 F.3d 573 (3d Cir. 1997) in noting that we had "previously expressed our concern over the 'dismaying inefficiency' of the black lung administrative process." 130 F.3d at 593 (quoting *Lango*, 104 F.3d at 575-76). The delay in *Lango* was 14 years, again substantially shorter than the delay that Mrs. Soubik was made to endure. We there gave several examples of inordinate

---

[14] Mrs. Soubik also argued that the delay was particularly unfair to her because she was 85 years old, implying that she might not live long enough to receive the benefits she was due if we did not direct the BRB to grant them. As noted above, Mrs. Soubik died before oral argument in this case. In light of her death, we need not now consider this argument. It is, however, an all too tragic example of the kind of hardship that can result from the all too frequent delay in these cases.

delay ranging from ten years[15] to as many as seventeen,[16] and even nineteen years.[17] We then stated, "[h]opefully, the publication of our concern will come to the attention of authorities who can do something about it." *Lango*, 104 F.3d at 576. We made that statement in 1997. Yet, even after that admonition, it took the BRB two years to remand this matter to the ALJ following our remand to the BRB. We therefore have little reason to think that the delays that attend black lung litigation have been mitigated or even addressed by the administrative agencies involved. Given our continuing concern, we take the liberty of reiterating at length the concerns we expressed in *Lango*:

> Were this the only case to come to our attention with such delay, we would be inclined to attribute it to a rare bureaucratic snag. However, we note that some recent black lung cases in this circuit suggest that this dismaying inefficiency is not unusual . . . . As far as we can tell, it appears that

many cases languish while waiting for an ALJ or the BRB to hear them. Although there may have been special circumstances in some of these cases that explain the delay, and we have not exhaustively examined the records, there is enough basis in the mere recitation of the facts to prompt consideration by the relevant administrators . . . .

Delays are especially significant for recipients of black lung benefits since most are nearing the end of their lives. Claimants have less time to use the benefits, and they often must wait when illness is increasing their expenses but while retirement has reduced their income. Worse, some may die before litigation resolves their claims.

Chief Judge Posner has expressed similar concerns about black lung cases in the Seventh Circuit. In *Amax Coal Co. v. Franklin*, 957 F.2d 355, 356 (7th Cir. 1992), he remarked:

> As so often in black lung cases, the processing of the claim has been protracted scandalously . . . Such delay is not easy to

---

[15] *See Gonzales v. Director, OWCP*, 869 F.2d 776 (3d Cir. 1989).

[16] *See Keating v. Director, OWCP*, 71 F.3d 1118 (3d Cir. 1995); *Kowalchick v. Director, OWCP*, 893 F.2d 615 (3d Cir. 1990).

[17] *See Kline v. Director, OWCP*, 877 F.2d 1175 (3d Cir. 1989).

understand. These are not big or complex cases . . . . The typical hearing lasts, we are told, no more than an hour . . . The delay in processing these claims is especially regrettable because most black lung claimants are middle-aged or elderly and in poor health, and therefore quite likely to die before receiving benefits if their cases are spun out for years. We hope that Congress will consider streamlining the adjudication of disability benefits cases (not limited to black lung) along the lines suggested by the Federal Courts Study Committee. See the Committee's *Report* (April 2, 1990), at pp. 55-58.

104 F.3d at 573-75. Protracted delay that results in claimants not living long enough to collect any benefits they might be entitled to is, in and of itself, an injustice that ought to be addressed. However, the situation is exacerbated by an exceptionally low rate of agency approval of benefit claims. "According to one commentator who cited official reports to Congress, the approval rate for applicants for federal black lung benefits is exceedingly low." *Id.* at 575-76 (citing Timothy F. Cogan, *Is the Doctor Hostile? Obstructive Impairments and the Hostility Rule in Federal Black Lung Claims,* 97 W. VA. L. REV. 1003, 1004 (1995)). The sweat and health of miners fueled much of the growth of the American economy. It is indeed unfortunate that they and their families must also now endure the kind of administrative ordeal evidenced by Mrs. Soubik's attempt to collect survivor's benefits.

Nevertheless, however frustrating this may be, as a court we can not direct the award of black lung benefits solely because of protracted administrative delay. *See Mancia*, 130 F.3d at 593. Although the length of any delay is a factor we have often considered when determining whether to remand for further consideration or to direct benefits, we previously noted that remand for an award of benefits is inappropriate where the record supports conflicting inferences. *Id.*; *Kowalchick v. Director, OWCP*, 893 F.2d 615, 624 (3d Cir. 1990).

Here, the unexamined evidence could support a finding for or against Mrs. Soubik. If Dr. Karlavage's opinion as a treating physician is given proper weight, and if the lay evidence is properly considered, the record supports only one result: an award of benefits to Mrs. Soubik. If, however, the ALJ had offered "specific and persuasive reasons" for

15

relying upon Dr. Spagnolo's opinion despite findings that are contrary to the parties' stipulation and the opinion of the treating physician, the record would support the ALJ's denial of benefits.

The ALJ and BRB have already had three chances to properly support a decision denying benefits. Yet the decision to deny benefits remains unsupported by the record. This, together with the outrageous delay, leads us to agree that circumstances here require that we direct benefits on remand. We see no point in remanding these issues for a *fourth* time when the ALJ and BRB have thus far been unable to justify elevating Dr. Spagnolo's opinion over that of the treating physician, the lay evidence, and the parties' own stipulation. *See Podedworny v. Harris*, 745 F.2d 210, 223 (3d Cir. 1984) (concluding that "it would be virtually impossible for the [government] in a third hearing to adduce the new vocational and medical evidence that would be necessary to support a finding that th[e] appellant is not disabled" in a social security benefits case, given significant "deficiencies in the record and the failure of the [government] to cure them in the second proceeding before the ALJ. . . .").

Dr. Karlavage's opinion was based on actual treatment as well as a record review. Dr. Karlavage's clinical expertise, derived from an extensive practice of treating miners, the corroboration of lay testimony, and the stipulation of the parties, provide more than sufficient support for Mrs. Soubik's claim absent a reasoned explanation for a contrary finding.[18] Accordingly, we believe that Mrs. Soubik, the original petitioner, has established her entitlement to survivor's benefits under the BLBA, and we will direct that an award of those benefits be entered on remand.

**IV.**

We will reverse the decision of the BRB entered on January 8, 2003, and remand the case for an award of benefits as of the appropriate commencement date. Since this case has been litigated for nearly two decades already, we assume that the BRB will expedite that award.

ROTH, *Circuit Judge*, dissenting:

My reading of the record in this appeal does not persuade me that it supports only *one* result - as is concluded by the Majority. Nor do I believe, pursuant to our standard of review – are the ALJ's factual findings rational, consistent with applicable law, and supported by substantial evidence on the record considered as a whole – that the Court is justified in reversing the judgment of the Benefits Review Board – however much I may feel personal sympathy for Mrs. Soubik.

I do, however, agree with the

---

[18] We reach this conclusion without disturbing the ALJ's finding that Dr. Wagner's opinion was too vague to be useful.

16

majority that the protracted delay in resolving federal black lung benefits cases is regrettable.