

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-28-2006

# Cyprus Cumberland v. Director OWCP

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1961

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

## Recommended Citation

"Cyprus Cumberland v. Director OWCP" (2006). *2006 Decisions.* Paper 1526.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1526

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-1961


CYPRUS CUMBERLAND RESOURCES,
Petitioner

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR;
CHARLES W. LEMUNYON,
Respondents


ON PETITION FOR REVIEW OF A DECISION
AND ORDER OF THE BENEFITS REVIEW BOARD,
UNITED STATES DEPARTMENT OF LABOR
Agency No. 04-0330 BLA


Submitted Under Third Circuit LAR 34.1(a)
February 14, 2006


Before: SCIRICA, Chief Judge, BARRY and FISHER, <u>Circuit Judges</u>


(Opinion Filed: February 28, 2006)


OPINION

BARRY, <u>Circuit Judge</u>

Petitioner Cyprus Cumberland Resources petitions this Court for review of a benefits award to a miner, Charles Lemunyon, pursuant to the Black Lung Benefits Act ("BLBA"), 30 U.S.C. § 901-945. We exercise jurisdiction pursuant to 33 U.S.C. § 921(c), and will deny the petition.

## I. Background

Charles Lemunyon began working in the coal mining industry in 1971. For more than 17 years of an approximately 20 year period, Lemunyon worked as a coal miner. For approximately 30 years, Lemunyon also smoked a pack of cigarettes each day. In 1991, while still working in the mines, Lemunyon sought medical treatment for respiratory problems from Dr. Joel Weinberg. He reported that, as of that time, his wheezing and coughing had been occurring for at least five years. Dr. Weinberg "gave him standard therapy to try to relax his bronchial tubes," and continued to treat him over the years. (A65) Dr. Weinberg would communicate with Lemunyon regularly by phone and would see him in his office every nine months. Lemunyon stopped working when the mine closed in 1993.[1]

On September 29, 1995, Lemunyon filed a claim for benefits, a claim which the

---

[1] As of that date, his position was Director of Safety. He briefly returned to mining in 1996, but "left the mine because of his breathing problem." (ALJ's 7/20/99 Op., A52; *see* Weinberg Dep., A70 (testifying that Lemunyon "developed more cough, more wheezing, more shortness of breath despite a pretty good regimen of medicines" upon returning to the mines in 1996).)

Department of Labor ("DOL") denied on March 27, 1996. On March 7, 1997, he submitted additional information to the DOL. The DOL treated that submission as a request for modification of the earlier decision and denied the request. On July 20, 1999, Lemunyon received a hearing before an administrative law judge ("ALJ").

The record evidence before the ALJ included the June 15, 1998 deposition testimony of Dr. Weinberg. Dr. Weinberg, board-certified in internal, pulmonary, and critical care medicine, had treated and examined Lemunyon as recently as March 5, 1998, at which time chest x-rays were taken, though no pulmonary function test was performed. When last given a pulmonary function test in February 1996, Lemunyon exhibited a "severe impairment of his exercise tolerance." (A67) It is undisputed that Lemunyon's respiratory problems prevent him from performing the job of a miner in the coal industry.

As for what caused the impairment, Dr. Weinberg "suspect[ed] . . . industrial bronchitis causing hyperrearctive airways." (A68) Lemunyon stopped smoking sometime in the mid-1980's,[2] and Dr. Weinberg observed that he "had persistent reactivity of his airways despite the fact he stopped smoking which is very, very unusual. . . . ." *Id*. Consequently, Dr. Weinberg attributed the condition "primarily to the continued exposure of his bronchial tubes to [coal] dust." (A69) Dr. Weinberg, who is

---

[2] *See* A68 (Dr. Weinberg testifies that Lemunyon stopped smoking in 1987); A86 (Dr. Fino testifies that Lemunyon "smoked a pack a day for 30 years stopping in 1982"); A97 (Dr. Cho's report lists a smoking history from 1956-1983).

not a "B reader",[3] (A75), also read Lemunyon's chest x-ray as exhibiting "simple pneumoconiosis." (A69) In sum, Dr. Weinberg diagnosed, within a reasonable degree of medical certainty, industrial bronchitis and coal workers' pneumoconiosis.

That opinion was not shared by Dr. Greg Fino. At his September 17, 1998 deposition, Dr. Fino testified to his qualifications in pulmonary medicine, including his status as a B reader of x-rays. Dr. Fino recounted that he examined Lemunyon on October 2, 1997, and ordered x-rays. Those x-rays "were negative for pneumoconiosis," (A87), but Dr. Fino did see impairments in Lemunyon's respiratory function. Ultimately, he diagnosed Lemunyon with "chronic obstructive pulmonary disease due to smoking," (A87), and opined, within a reasonable degree of medical certainty, that Lemunyon did "not suffer from an occupationally acquired lung condition." (A88)

A third physician's opinion also appears in the record. Following a January 11, 1996 examination, Dr. Yong Dae Cho diagnosed Lemunyon with totally disabling chronic obstructive pulmonary disease. The cited causes were coal dust, cigarettes, and asthma. (A99)

The ALJ determined that, based on the record, "legal" pneumoconiosis had been established. Of particular relevance here is the ALJ's finding

that, despite the preponderance of the negative x-ray evidence and

---

[3] "A 'B reader' is a physician . . . who has demonstrated proficiency in reading x-rays for pneumoconiosis" and "[c]ourts generally give greater weight to x-ray readings performed by 'B readers.'" *Labelle Processing Co. v. Swarrow*, 72 F.3d 308, 310 n.3 (3d Cir. 1995).

4

Claimant's significant smoking history, the opinions of Drs. Cho and Weinberg are most consistent with the Claimant's longstanding history of shortness of breath which continued long after the Claimant stopped smoking; the lack of reversibility despite multiple treatment efforts; the abnormal results on the pulmonary function studies; the progressive and irreversible nature of pneumoconiosis; and Claimant's history of more than 17 years of coal mine employment. Furthermore, Dr. Weinberg had been Claimant's treating physician for over an extended period of time, dating back to October 1991.

(A55-56) The Benefits Review Board ("BRB") vacated that decision on August 20, 2000, concluding that the ALJ had not adequately assessed the testimony of the medical personnel nor weighed all of the evidence.

On remand, the ALJ again awarded benefits to Lemunyon, explaining in greater detail his assessment of each physician's proffered opinion. In particular, he found

the medical reports and deposition testimony of Dr. Joel H. Weinberg to be persuasive. Dr. Weinberg is a highly qualified physician who is Board-Certified in Internal Medicine, Pulmonary Medicine and Critical Care Medicine. In addition, he has been the Claimant's treating physician since October of 1991 and as such knows the Claimant and his condition better than any other physician of record. Dr. Weinberg's diagnosis of industrial bronchitis is well-reasoned and supported by the diagnostic studies, Claimant's history of underground coal mine employment, medical history, social history, Claimant's progressively worse symptoms that have continued long after the Claimant stopped smoking, and findings on physical examination. For all these reasons I accord greater weight to the opinion of Dr. Weinberg.

(A40) The BRB initially affirmed that decision, but in February 2003, on a motion for reconsideration, again vacated the award. The BRB concluded that the ALJ had not adequately explained why he discounted Dr. Fino's opinion, and remanded.

The ALJ, on remand, once again awarded benefits. He incorporated by reference

5

his prior discussion of Dr. Weinberg's opinion, and concluded that

> [a]lthough the reports of Drs. Fino, Weinberg, and Cho are reasoned and documented, I nevertheless find that the opinion of Dr. Fino is outweighed by the opinions of Drs. Cho and Weinberg. As discussed previously, I accord great weight to the opinion of Dr. Weinberg, who was Claimant's treating physician since 1991. I find that the status as treating physician afforded Dr. Weinberg a greater familiarity with Claimant's condition. Dr. Weinberg's opinion is highly persuasive and is supported by the objective diagnostic studies, Claimant's history of underground coal mine employment, medical history, social history, Claimant's progressively worse symptoms that continued long after Claimant stopped smoking, and findings on physical examination. Moreover, I find the opinion of Dr. Weinberg is supported by the well-reasoned opinion of Dr. Cho.

(A22) The BRB affirmed the award and denied reconsideration. This timely appeal followed.

## II. Standard of Review

The BRB, when reviewing an award of benefits, must "accept the ALJ's findings of fact if supported by substantial evidence." *Balsavage v. Director, OWCP*, 295 F.3d 390, 395 (3d Cir. 2002). If findings of fact are challenged on appeal, our charge is to "determine whether the [BRB] adhered to its statutory scope of review." *Id.*; *see Mancia v. Director, OWCP*, 130 F.3d 579, 584 (3d Cir. 1997) (doing so requires us to "examine the entire record and determine if the ALJ's decision is supported by substantial evidence.").[4] In this case, however, raises a legal issue for our review, namely, whether

---

[4] "Substantial evidence has been defined as more than a mere scintilla." *Kowalchick v. Director, OWCP*, 893 F.2d 615, 619 (3d Cir. 1990) (citation and quotation marks omitted). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Soubik v. Director, OWCP*, 366 F.3d 226, 233 (3d Cir. 2004). We

(continued...)

6

the award of benefits was the result of an improper application of a "treating physician's rule." We exercise plenary review over that issue. *See Soubik v. Director, OWCP*, 366 F.3d 226, 233 (3d Cir. 2004); *Kowalchick v. Director, OWCP*, 893 F.2d 615, 619 (3d Cir. 1990).

## III. Discussion

The BLBA provides benefits "to coal miners who are totally disabled due to pneumoconiosis." 30 U.S.C. § 901(a). Pneumoconiosis, otherwise known as black lung disease, is defined as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." *Id.* § 902(b); 20 C.F.R. § 718.201(a). "The 'legal' definition of pneumoconiosis (i.e. any lung disease that is significantly related to, or substantially aggravated by, dust exposure in coal mine employment) is much broader than the medical definition, which only encompasses lung diseases caused by fibrotic reaction of lung tissue to inhaled dust." *Labelle Processing Co. v. Swarrow*, 72 F.3d 308, 312 (3d Cir. 1995). Here, the parties do not dispute Lemunyon's disability, but rather contest whether his condition is "due to pneumoconiosis" resulting from his employment in the coal mines. *Cf.* 20 C.F.R. § 718.201(b), (c) ("[A] disease 'arising out of coal mine employment' includes any chronic pulmonary disease or respiratory or pulmonary impairment significantly related to, or

---

[4](...continued)
must affirm the ALJ's decision "even if we 'might have interpreted the evidence differently in the first instance.'" *Balsavage v. Director, OWCP*, 295 F.3d 390, 395 (3d Cir. 2002).

substantially aggravated by, dust exposure in coal mine employment," and "'pneumoconiosis' is recognized as a latent and progressive disease which may first become detectable only after the cessation of coal mine dust exposure.").

In the ALJ's final decision awarding Lemunyon benefits, he "accord[ed] great weight to the opinion of Dr. Weinberg, who was Claimant's treating physician since 1991," and found "that the status of treating physician afforded Dr. Weinberg a greater familiarity with Claimant's condition." (A22) The BRB agreed:

> Contrary to employer's assertion, although the administrative law judge may not mechanically accord greater weight based solely upon the physician's status as the treating physician, the [ALJ] is not prohibited from according weight to the opinion based upon more than a mechanical recognition of the physician's status as a treating physician.

(A17) Petitioner argues before us that the ALJ improperly deferred to the treating physician's opinion. We disagree.

The weight accorded to Dr. Weinberg's opinion was consistent with the "general principles by which an ALJ must evaluate medical evidence." *Mancia v. Director, OWCP*, 130 F.3d 579, 588 (3d Cir. 1997). We have applied those principles to black lung cases for decades:

> In reaching a decision, an ALJ should set out and discuss the pertinent medical evidence presented. The ALJ is not bound to accept the opinion or theory of any medical expert, but may weigh the medical evidence and draw its own inferences. Moreover, the ALJ should reject as insufficiently reasoned any medical opinion that reaches a conclusion contrary to objective clinical evidence without explanation.
> In weighing medical evidence to evaluate the reasoning and credibility of a medical expert, however, the ALJ may not exercise absolute discretion to credit and discredit the expert's medical evidence. An ALJ is not free to set

8

his own expertise against that of a physician who presents competent evidence.

*Kertesz v. Director, OWCP*, 788 F.2d 158, 163 (3d Cir. 1986) (citations and internal quotation marks omitted).  "The ALJ has broad discretion to determine the weight accorded each doctor's opinion." *Balsavage*, 295 F.3d at 396.  One consideration an ALJ is permitted to make in weighing the medical evidence is the relationship between the physician and the claimant.  *See Mancia*, 130 F.3d at 590 ("[T]he opinion of a miner's treating physician 'plays a major role in the determination of eligibility for black lung benefits.'") (citation omitted); *Balsavage*, 295 F.3d at 396.

As we made clear in *Soubik*, "[i]t is well-established in this circuit that treating physicians' opinions are assumed to be more valuable than those of non-treating physicians."  366 F.3d at 235.  Contrary to petitioner's argument, however, this assumption does not turn on impermissibly mechanical deference to the treating physician's opinion.  Indeed, in *Soubik*, we did not automatically defer to the treating physician: "The ALJ stated that he did not credit Dr. Karlavage's opinion as that of a treating physician because Dr. Karlavage had only seen Soubik three times over six months.  That was, of course, three more times and six months more than Dr. Spagnolo saw him." *Id.*  Here, although Dr. Fino did examine Lemunyon, the ALJ appropriately evaluated the relative length and nature of each relationship.  Dr. Weinberg regularly treated Lemunyon over the course of years.  The ALJ was not required to ignore the disparity between each physician's interactions with the patient.

Petitioner would have us extend the reasoning of *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003) to this case, and cites the Sixth Circuit's opinion in *Eastover Mining Co. v. Williams*, 338 F.3d 501 (6th Cir. 2003) in support of that request. Neither opinion is apposite. The *Nord* Court held that in the ERISA context a plan administrator is under no obligation to automatically defer to a treating physician's opinion, unlike in the Social Security disability context. *Nord*, 538 U.S. at 829. In the Social Security disability context, a treating physician's opinion is given "more weight" and divergence from that opinion must be explained. *See id.* (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). We have never required such deference to a treating physician in black lung cases, instead permitting an ALJ to give greater weight when appropriate in light of the particular relationship. This approach is perfectly consistent with *Nord*, as well as with the Sixth Circuit's application of *Nord* in the black lung context.[5]

In *Eastover Mining*, the Sixth Circuit, applying *Nord*, found that there should be no additional deference given to a treating physician solely based on status as a treating physician, identifying a "simple principle" that "in black lung litigation, the opinions of treating physicians get the deference they deserve based on their power to persuade." *Eastover Mining*, 338 F.3d at 513. "For instance, a highly qualified treating physician who has lengthy experience with a miner may deserve tremendous deference, whereas a

---

[5] It is worth noting that *Nord* predated our decision in *Soubik*, and we did not discuss *Nord* in *Soubik*.

treating physician without the right pulmonary certifications should have his opinions

appropriately discounted." *Id.* Consistent with our approach, the Sixth Circuit

emphasized that automatic deference to a treating physician is unwarranted in black lung

cases, but that the relationship may be considered for what it is worth.[6]

---

[6] A District of Columbia court has summarized the three contexts:

> The treating physician rule has been discussed in several federal contexts. With regard to Social Security, the rule is set forth by regulation adopted in 1991. . . If it is found that the treating source's opinion is well-supported by medically acceptable clinical and laboratory evidence, the SSA will give it controlling weight. . . .

> The treating physician rule was specifically rejected in the ERISA context by the Supreme Court in [*Nord*]. . . . [T]he Court noted that critical differences between Social Security and ERISA demonstrated that the rule was not appropriately applied to ERISA; the treating physician rule was appropriate for efficient operation of the large and mandatory Social Security benefits system, but not to the diverse realm of employee benefit plans, which are not required by ERISA.

> Under the Black Lung statutes, "an agency adjudicator may give weight to the treating physician's opinion when doing so makes sense in light of the evidence and the record, but may not mechanistically credit the treating physician solely because of his relationship with the claimant."

*Lincoln Hockey, LLC v. D.C. Dep't of Empl. Servs.*, 831 A.2d 913, 921 n.7 (D.C. 2003) (citations omitted)

We need not decide whether we agree with the *Eastover Mining* Court's determination that the black lung context is "much more like" ERISA than the Social Security context. *See id.* at 513 n.14. We simply note that black lung cases arguably fall somewhere between the two. Black lung claims may not create the flood of cases that courts must "cope" with in the area of Social Security. *See Nord*, 538 U.S. at 833. Also, at least as of the time of Lemunyon's claim, the relevant regulations had yet to account for the appropriate weight accorded to a treating physician's opinion, unlike in Social Security. But, much like Social Security benefit determinations, "the adjudicator measures the claimant's condition against a uniform set of federal criteria." *Id.*

11

As we observed in *Lango v. Director, OWCP*, 104 F.3d 573 (3d Cir. 1997), "although there is some question about the extent of reliance to be given a treating physician's opinion when there is conflicting evidence, the ALJ may permissibly require the treating physician to provide more than a conclusory statement . . . ." *Id.* at 577 (citations omitted). Accordingly, we would not defer to the opinion of a treating physician who "gave no basis for [his] conclusion," despite the fact that he had treated the claimant "for many years." *Id.* Here, Dr. Weinberg did give a basis for his conclusion, one which persuaded the ALJ.

In the end, all relevant factors may and should be considered in weighing each physician's opinion, including factors that might discount a treating physician's opinion, such as lack of expertise or evidence of undue bias. *Cf. Eastover Mining*, 338 F.3d at 517 ("This seems like a case in which the treating physician wanted to help his patient's family."). Here, the treating physician was a pulmonary specialist with a long history of treating the miner, and no evidence has been proffered that Dr. Weinberg's conclusions were "changed . . . to meet Respondent's needs." *Eastover Mining*, 338 F.3d at 516. Nor did the ALJ's appropriate consideration of the relationship between Dr. Weinberg and Lemunyon form the entire basis of his award. The ALJ wrote, in a part of his January 11, 2001 decision affirmed by the BRB and incorporated by reference in his final decision, that he found "Dr. Cho's medical report to be well-reasoned and consistent with the objective diagnostic testing, Claimant's history of 17 years of coal mine employment, Claimant's medical and social histories, symptoms of the Claimant, and his findings on

12

physical examination." (A40 ("Furthermore, I find Dr. Cho's diagnosis of chronic obstructive pulmonary disease . . . due to coal dust exposure, smoking, and asthma to be consistent with the Claimant's long history of shortness of breath which continued long after the Claimant stopped smoking, the lack of reversibility despite multiple treatment efforts, the abnormal pulmonary function tests, and the progressive and irreversible nature of pneumoconiosis.").)

When turning to the assessment of Dr. Weinberg's opinion, the ALJ relied on the physician's qualifications, his intimate knowledge of Lemunyon's condition, and the support found in the record, including the fact that Lemunyon's "progressively worse symptoms . . . continued long after [he] stopped smoking." (A40 ("For all these reasons I accord greater weight to the opinion of Dr. Weinberg."); *see* BRB Op., A17 ("In this case, the [ALJ] acted within his discretion as fact-finder in concluding the opinion of Dr. Weinberg, in comparison to the contrary opinion of Dr. Fino, was highly persuasive and based on several rational grounds, one of which was that Dr. Weinberg was claimant's treating physician.") (citations omitted))[7] The ALJ appropriately accounted for the

_____

[7] The black lung benefits determination rests squarely on deference to the general experience of medical personnel. *Cf. Director, OWCP v. Mangifest*, 826 F.2d 1318, 1327 (3d Cir. 1987) ("[L]ike other judgments, a medical judgment is sometimes based upon instinct, the unarticulated and unarticulable opinion that is nonetheless grounded in years of experience. Apparently out of respect for this medical intuition, the regulations permit an ALJ to find total disability on the basis of medical judgments even if the medical tests are inconclusive."). In any one case, however, a permissible consideration, albeit not controlling, is the specific experience with the claimant. Here, Dr. Weinberg's experience with Lemunyon was substantial.

relationship between Dr. Weinberg and Lemunyon when weighing all the record evidence.[8]

## IV. Conclusion

Accordingly, we will deny the petition for review.

---

[8] Although not in force at the time of Lemunyon's claim, the DOL has since codified the appropriate approach to be taken to the assessment of a treating physician's opinion. *See* 20 C.F.R. § 718.104(d) (2001); *see also Nord*, 538 U.S. at 830 n.3 ("Some courts have approved a rule similar to the Social Security Commissioner's for disability determinations under the Longshore and Harbor Worker's Compensation Act, and the Secretary of Labor has adopted *a version* of the rule for benefit determinations under the Black Lung Benefits Act.") (citations omitted) (emphasis added).